600 P.2d 97 (1979)
The PEOPLE of the State of Colorado, Plaintiff-Appellee,
v.
Rudy SAIZ, Defendant-Appellant.
No. 76-883.
Colorado Court of Appeals, Div. II.
May 24, 1979.
Rehearings Denied June 21, 1979.
Certiorari Denied September 24, 1979.
*98 J. E. Losavio, Jr., Dist. Atty., Clinton A. Smith, Chief Deputy Dist. Atty., Pueblo, for plaintiff-appellee.
J. Gregory Walta, Colorado State Public Defender, Ilene P. Buchalter, Deputy State Public Defender, Denver, for defendant-appellant.
BERMAN, Judge.
Defendant appeals from convictions, entered upon jury verdicts, of first degree (felony) murder, first degree burglary, and *99 aggravated robbery. We reverse and remand for a new trial.
On defendant's motions to suppress statements and tangible evidence, the trial court found the following facts. On August 17, 1974, a man was found in his home, severely beaten, the effects of which caused his death the following day. By talking to various witnesses, the police learned that a young man had been seen coming out of the victim's yard with a hammer, that a hammer had been seen on the roof of a shed nearby, and that defendant, a sixteen-year-old, had been seen cutting through a neighbor's backyard and inside another neighbor's garage at material times. The description of the clothing worn by defendant was similar to that worn by the young man with the hammer.
On August 20, two officers went to defendant's home and "requested" that he accompany them to the police station. Defendant and his mother did so.
Upon arrival at the station defendant was questioned, as a "witness," regarding his whereabouts on the morning of August 17. When defendant stated that he had not left his home that morning, the police realized he was lying and advised him of his rights.
Defendant and his parents then agreed to, and he was given, a polygraph examination. From the results, the police believed that defendant was either involved in, or that he had knowledge of the incident. Upon being told of the test results, defendant's mother talked to defendant privately, and he told her that he had found the victim's wallet and that he had overheard a conversation implicating two individuals. Defendant's mother relayed this information to the officers, and defendant was kept in custody overnight.
The following morning, officers talked to defendant, out of the presence of his parents, regarding the information obtained from defendant's mother. The police also talked to one of the individuals defendant had referred to, and were told "a story by him that differed from what defendant had said." When confronted with this account, defendant stated that he had been walking near the victim's house when he saw someone come running down the alley behind the house. This person, who was carrying a hammer, fell down and dropped a wallet. After the person got up and kept running, defendant picked up the wallet, removed the $40 in it, and discarded it. Defendant agreed to show the police where he had discarded the wallet, and did so.
Upon returning to the police station after recovering the wallet, on the way to look at police photos to determine whom he had seen drop the wallet, defendant stated that he and another person "did it." At this point, questioning ceased, and defendant's parents were brought to the station.
Defendant and his parents were advised of his rights at the outset of the ensuing interview (the "noon-to-one statement"). After defendant and his father agreed to proceed without an attorney, defendant denied involvement in the incident, reverting to his prior statement that he saw someone else drop the wallet. Defendant subsequently stated that he did not want to say any more, but, after continued urging to tell the truth by the officers and defendant's mother, he stated that he had stood watch while someone else went into the victim's house. Defendant's parents agreed to supply the police with the clothing worn by defendant on August 17.
At the conclusion of the noon-to-one statement defendant agreed to take another polygraph test. During this test, outside the presence of his parents, defendant stated that he alone was responsible. This final statement was then repeated by defendant in front of his parents.
The police then went to defendant's house, and defendant's father gave them the clothing which defendant had worn on August 17. Expert testimony at trial was to the effect that a dog hair subsequently found on this clothing matched a hair found on the victim's pants as to seventeen of eighteen characteristics. The expert opined that the hairs had "a common source of origin."
*100 The trial court suppressed all statements made by defendant out of the presence of his parents under § 19-2-102(3)(c)(I), C.R.S. 1973. The final statement made by defendant was also suppressed because the trial court found that, although defendant's parents were present, "the original taint of illegality had in no way been removed." The noon-to-one statement, however, was found to be made under circumstances "sufficiently distinguishable to purge [it] of the original taint," apparently because, at the beginning of this statement, defendant denied any involvement in the incident, and his inculpatory statement was made upon continued urging by his parents as well as the officers. The wallet was admitted because it was obtained by the officers "with the cooperation of defendant," and the clothing was admitted because it was obtained as a result of the consent of defendant and his father.

I.
Defendant's principal argument is that the noon-to-one statement should have been suppressed because, among other things, it was made when the officers continued to interrogate him after ignoring his attempt to exercise his right to remain silent. We agree that the statement was improperly admitted.
As a preliminary, we note that when reviewing allegations which concern the deprivation of fundamental rights, we can not be concerned with either the heinous nature of the crime or the depravity of the defendant. See Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court made it clear that: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (emphasis added) Here, during the noon-to-one statement, but before the inculpatory portion thereof, defendant responded to one of the officer's questions by stating, "I ain't going to say nothing no more." It is difficult to imagine a clearer assertion by defendant of his right to remain silent. Yet, as the trial court found, "The officers ... continued to urge defendant to tell the truth."
In fact, the transcript of the noon-to-one statement reveals that, from immediately after defendant attempted to exercise his right to remain silent, until his inculpatory statement, the police officers made the following statements:
"All we want is the truth, Rudy, just right down the line, the exact truth.
.....
All we want is the truth, Rudy, nobody's trying to railroad you or anything. We want the exact truth....
.....
Rudy, the truth is going to be somewhat unpleasant, now all of us know that. But I think you best just get it over with now than some other time.
.....
We don't want to add anything, all we want is the straight truth....
.....
Rudy, it's unpleasant and it's a mess, but I think I'd [sic] levelled with you this morning and I think you were levelling with me this morning when you talked to Roybal, and you might as well get it out.
.....
You can't live with that in you anyway.
Its [sic] happened, its [sic] done with, the mistakes [sic] made. Now, we're going to have to get the truth of it out. People responsible are going to have to pay for their mistake.
Why don't we start all over, Rudy, and get it straight, one time, while your mother and dad are here. You want to do that?"
Under these circumstances we find it impossible to say that defendant's "`right to cut off questioning' was `scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). See People v. Pearson, 190 Colo. 313, 546 P.2d 1259 (1976).
*101 This is not a case such as People v. Naranjo, 181 Colo. 273, 509 P.2d 1235 (1973), where the questioning was halted for a number of hours and then renewed after additional Miranda warnings. In that case it was noted that "[W]hat the Supreme Court condemned in Miranda were those cases in which the police refuse to take `no' for an answer and continue to question, harass and coerce the defendant to cast aside his desire to exercise his constitutional right to remain silent." This is precisely the situation here. Cf. People v. Harris, 191 Colo. 234, 552 P.2d 10 (1976) (defendant's request for an attorney, although "not in the most sophisticated or legally proper form," was adequate and all questioning should have ceased at that time).
The trial court made no express finding on this issue. But, in finding that the taint of the prior, illegally obtained statement was purged, the trial court relied on the fact that defendant's parents, as well as the police, continued to urge him to speak. In a case such as this, however, where the police were actively involved in the continued urging of defendant "to tell the truth," we fail to see how the parents' behavior can be said to absolve the police of any wrongdoing, and to allow them to disregard defendant's exercise of his right to cut off questioning. "[T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults." In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
The prosecution's contention, that defendant's exercise of his right to remain silent was limited to questions regarding clothing, has no support in the record. In fact, the final question before defendant's assertion of his constitutional right included a reference to defendant's prior, illegally obtained statement, which was not related solely to defendant's clothing.

II.
We also agree with defendant's contention that the victim's wallet should have been suppressed. In People v. Maes, Colo., 571 P.2d 305 (1977), it was held that:
"[T]he clear purpose in enacting section 19-2-102(3)(c)(I) of the Children's Code is to afford a special protection to a juvenile who is in police custody because of alleged criminal acts. This special protection provides an additional and necessary assurance that the juvenile's Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel will be fully afforded to him."
Physical evidence which is the fruit of a statement improperly obtained from an adult is inadmissible, e. g., People v. Vigil, 175 Colo. 373, 489 P.2d 588 (1971), and we can discern no reason why the rights of a juvenile in this regard should be any less than those of an adult. See People v. Reyes, 174 Colo. 377, 483 P.2d 1342 (1971); People in the Interest of B.M.C., 32 Colo. App. 79, 506 P.2d 409 (1973). See also People in the Interest of C.B., Colo., 585 P.2d 281 (1978). We hold, therefore, that the wallet should have been suppressed because there was nothing to purge it of the taint of the statements elicited from defendant in violation of § 19-2-102(3)(c)(I), C.R.S.1973.

III.
Having determined that the wallet and the noon-to-one statement should have been suppressed, we find it impossible to say that "it is clear beyond a reasonable doubt" that this evidence did not contribute to defendant's conviction. Early v. People, 178 Colo. 167, 496 P.2d 1021 (1972).
In this case there was not "an overwhelming amount of competent evidence apart from this disputed evidence ..." People v. Thomas, 189 Colo. 490, 542 P.2d 387 (1975). Absent the statement and the wallet, there was no direct evidence which linked defendant to the crime. Although the dog hairs might in some circumstances be highly probative, here there was no evidence that either the victim or defendant owned, or had been in contact with a dog. Thus the hairs are not as significant as they would be if, as in the more common situation, a hair belonging to the defendant was found on the victim or vice versa.
*102 Here, the combination of the statement and the wallet was so damning that it must have had a "substantial influence on the verdict." People v. Hanson, 189 Colo. 101, 537 P.2d 739 (1975). The error, therefore, is not harmless and the convictions must be reversed. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

IV.
As to defendant's clothing, the evidence showed that it was obtained from defendant's home by defendant's father and was given by him to the police. This is sufficient to support the trial court's finding of consent, see Spencer v. People, 163 Colo. 182, 429 P.2d 266 (1967), and therefore the clothing was properly admitted.

V.
Defendant makes several other arguments which, because they might occur on retrial, we now address.
Defendant argues that the trial court erred in allowing expert testimony regarding a comparison of hairs removed from defendant's shirt and the victim's pants. Defendant claims that the chain of custody was not complete. We disagree.
There was evidence that the victim's pants were removed from him at the hospital, and put in a bag which was tied and given to the victim's granddaughter. She delivered the bag to the police who later delivered the bag to the expert who found the hair. Defendant's shirt, which was obtained by the police from defendant's father, was taken to the police station, put in a bag, sealed, and later delivered to the expert. This evidence was sufficient to establish the necessary chain of custody to allow admission of the testimony. See People v. Atencio, Colo., 565 P.2d 921 (1977); People v. Sanchez, 184 Colo. 25, 518 P.2d 818 (1974); People v. Smith, 182 Colo. 228, 512 P.2d 269 (1973). The cited cases make it clear that defendant's speculative arguments that the hairs might have been picked up by the clothing from the bags or from the police carsmight affect the weight of the evidence, but not its admissibility.
Defendant also argues that the trial court's withdrawal of one charge of the indictment was an amendment prohibited by Crim.P. 6.8(b). We disagree.
The withdrawal of a charge, because of a lack of evidence to support it, is not an "amendment" to the indictment. See Salinger v. United States, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926). And the purpose of the rule, "to insure that an indictment reflects the will of the grand jury," People v. Campbell, Colo., 573 P.2d 557 (1978), is not contravened by the withdrawal of a charge. We conclude that the trial court's ruling was not improper.
Defendant's other arguments concern alleged errors regarding instructions. He first claims that the trial court improperly instructed the jury on complicity and that, by doing so, the court erroneously extended the felony murder doctrine. We disagree.
One who comes under the complicity statute, § 18-1-603, C.R.S.1973, is equivalent to a principal. People v. Cox, 190 Colo. 326, 546 P.2d 956 (1976). And there is no indication in that statute that it does not apply to felony murder. It follows that a complicitor, being a principal, is included in the felony murder statute as one who "commits or attempts to commit [the underlying felony]." Section 18-3-102(1)(b), C.R.S.1973. See Whitman v. People, 161 Colo. 110, 420 P.2d 416 (1966).
Defendant next claims that he was entitled to instructions on the lesser offenses of second degree murder and criminally negligent homicide. Where, as here, however, all the evidence shows that the death was caused during the commission of a felony, such instructions are not necessary. See Kurtz v. People, 177 Colo. 306, 494 P.2d 97 (1972).
Because we do not know what the evidence will be on retrial, we do not address defendant's arguments that he was entitled to instructions on simple robbery, and that mere presence at the scene of a crime is insufficient to convict.
*103 The judgments are reversed and the cause is remanded for a new trial to be held in accordance with the views expressed herein.
ENOCH and VAN CISE, JJ., concur.