**No. 80SA104**

**The People of the State of Colorado v. James A. Lowe**

(616 P.2d 118)

Decided September 2, 1980.

Dale Tooley, District Attorney, Brooke Wunnicke, Chief Appellate Deputy District Attorney, O. Otto Moore, Assistant, Donald Eberle, Deputy, for plaintiff-appellant.

J. Gregory Walta, Colorado State Public Defender, Ilene P. Buchalter, Deputy, for defendant-appellee.

*En Banc.*

JUSTICE LOHR delivered the opinion of the Court.

In this interlocutory appeal the People challenge the trial court's ruling granting the defendant's motion to suppress certain statements made by him and certain physical evidence. We affirm.

On June 26, 1979, Michelle Conley, an 11-year-old girl, was swimming at the Pinehurst County Club (Club) in Denver. At approximately 8:00 p.m. she left the pool area to go to the women's locker room. When she did not return by 8:40 p.m., a search for her was commenced. The police were called at about 9:00 p.m. and, following an extensive search, Michelle's body was found in a maintenance room at the Club at 1:45 a.m., June 27, 1979. The location and condition of the body indicated that the girl was the victim of a homicide.

At 2:26 a.m. on June 27, 1979, Detective Wyckoff began an investigation into the homicide. After several hours, numerous witnesses had been questioned and it became apparent that the defendant was the primary suspect. Two police officers were then sent to the defendant's resi-

dence where he was arrested at approximately 5:40 a.m., June 27, 1979.[1] He was then taken to the police station.

Detective Wyckoff arrived at the police station at 6:40 a.m. and directed the defendant to an inner office. Before advising the defendant of his *Miranda*[2] rights, Detective Wyckoff asked the defendant, "Do you know why you are here?". The defendant responded, "I know. I kind of thought you would be out to the house at 6:00."

Following this statement, at 6:54 a.m. the detective advised the defendant of his *Miranda* rights. The defendant stated that he understood his rights. He signed an advisement form acknowledging an understanding of his rights but did not sign the portion of the form which contains a statement that the subject wishes voluntarily to talk to the police. The detective did not ask the defendant if he wished to waive his privilege against self-incrimination and his right to counsel. The detective simply told the defendant that he wanted him to tell what had happened. In response to this request, the defendant said it was his girlfriend's fault and either her parents' fault or his parents' fault. The defendant appeared to be sober and coherent at this time, although his eyes were red and he was somewhat upset. The detective used no promises, threats, force, or coercion against the defendant.

At 7:14 a.m. on June 27, 1979, the detective began to interrogate the defendant. This interview was tape recorded. At the commencement of the interview the defendant was again advised of his *Miranda* rights and he indicated that he understood them. During the course of this interrogation, the defendant was asked where he obtained equipment that he used on Michelle. The defendant answered that he did not want to talk about it. The detective made no determination as to whether the defendant was claiming his privilege against self-incrimination, but continued the interrogation.

During the interrogation, the defendant confessed that he had killed Michelle; identified the clothes he was wearing the previous night; and identified the locker at the Club in which he had placed those clothes. Following the interview, the defendant signed a consent to search that locker. The locker was searched later that morning and several articles were seized.

---

[1] The issues of whether there had been an arrest and whether there was probable clause to make an arrest were before the trial court. The court decided that an arrest had occurred when the defendant was picked up at his residence and that the officers had probable cause to make the arrest. Because these issues were decided in favor of the People, they are not before the court on this appeal. *See* C.A.R. 4.1. Even if the defendant was not technically under arrest, there can be little doubt that he was "seized" in the Fourth Amendment sense. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

[2] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The defendant was charged with murder in the first degree, section 18-3-102, C.R.S. 1973 (1978 Repl. Vol. 8), and first-degree kidnapping, section 18-3-301, C.R.S. 1973 (1978 Repl. Vol. 8), based upon the events surrounding the death of Michelle Conley. After a preliminary hearing in the county court, only the first-degree murder charge was bound over to the district court for trial.

In the district court, the defendant moved to suppress the statement he made prior to the time he was given his *Miranda* rights; the statements he made in the tape-recorded interview which began at 7:14 a.m.; the articles which were found in his locker at the Club as a result of the search to which he had consented; and the written consent to search the locker.[3] A hearing was held and the trial court suppressed all statements and the evidence found in the locker. We conclude that the trial court ruled properly.

## I.

■ The People first contend that the initial question by Detective Wyckoff, "Do you know why you are here?", did not constitute custodial interrogation within the meaning of *Miranda v. Arizona, supra.* Accordingly, the People argue that no *Miranda* warnings were required and that the defendant's response to this question should not have been suppressed as having been obtained in violation of his constitutional rights.[4]

There is no doubt that the defendant was in custody, as he was under arrest at the time he was asked the question. Our inquiry therefore focuses solely on whether the defendant was "interrogated" by the detective in violation of the standards promulgated in *Miranda v. Arizona, supra.*

We are aided in our consideration of this question by the United States Supreme Court's recent interpretation of "interrogation" as that term is used in *Miranda.* In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court said:

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term ''interrogation'' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of

---

[3] The motion was framed in general terms; the specific items listed are included within the general terms used in the motion and are the items involved in this interlocutory appeal.

[4] The trial court found that the defendant's response was obtained in violation of his privilege against self-incrimination, U.S. Const. amend. V, Colo. Const. art. II, § 18, and his right to counsel, U.S. Const. amend. VI, Colo. Const. art. II, § 16.

protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."

*Id*. at _____, 100 S.Ct. at 1689-1690 (footnotes omitted). In a footnote, the Court further stated that it was not saying that intent of the police is irrelevant. The Court recognized that intent

"may well have a bearing on whether the police should have known that their words or actions were reasonably likely to envoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect."

*Id*. at _____, n. 7, 100 S.Ct. at 1690.

In the case at bar, at the hearing on the motion to suppress, Detective Wyckoff stated that he had no intention of advising the defendant of his rights until the defendant made a statement to him. Based on this testimony, the trial court found that the detective's intent in asking the defendant the question as to why he was at the police station was to elicit a response from the defendant that would involve him in the homicide. This finding was supported by the record and will not be disturbed on review. *People v. Martinez*, 186 Colo. 388, 527 P.2d 534 (1974).

Accordingly, we find that under the standards enunciated in *Rhode Island v. Innis, supra,* the detective's initial question to the defendant constituted custodial interrogation. The detective intended to elicit an incriminating response from the defendant. Given the circumstances of this case, the detective should have known that his question was reasonably likely to elicit an incriminating response from the defendant. The trial court properly suppressed the defendant's response to this question.

## II.

The People next argue that the trial court improperly suppressed the defendant's tape-recorded statement. The trial court suppressed the statement on two grounds. The court first found that the tape-recorded statement was "fruit of the poisonous tree";[5] i.e., it was so tainted by the illegal custodial interrogation discussed in Part I as to render that statement illegal. The court also found that the tape-recorded statement was not based on a knowing, voluntary, and intelligent waiver of the defendant's *Miranda* rights.

■ The burden is on the prosecution to establish that the tape-recorded statement was not the product of the defendant's prior

---

[5] *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Orf, Jr.,* 172 Colo. 253, 472 P.2d 123 (1970).

incriminating response, which was illegally obtained. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). The prosecution failed to meet its burden in the instant case.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court held that not all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. If the evidence to which the objection is made has been produced by exploitation of the initial illegal police action, the evidence is tainted and inadmissible. But if the evidence has been obtained by means sufficiently distinguishable to be purged of the primary taint, the evidence is admissible. *Id.; People v. Bates,* 190 Colo. 291, 546 P.2d 491 (1976). Thus, if passage of time has caused the connection between the initial illegal police action and the offered evidence to become so attenuated as to dissipate the taint, the evidence is admissible. *Wong Sun v. United States, supra; People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972).

■ Simply reading a defendant his *Miranda* rights is not necessarily sufficient to purge the taint of the initial illegal questioning by breaking the causal chain between that questioning and the statement obtained subsequent to the time the defendant received his *Miranda* rights. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We agree with the trial court's conclusion that the 7:14 a.m. statement was not purged of the taint of the illegally obtained oral statement which was made by the defendant at some time between 6:40 a.m. and 6:54 a.m. Rather, it appears that the questioning which took place beginning at 7:14 a.m. was merely a continuation of the question which had elicited the previous incriminating remark. The two statements were made within 35 minutes of each other. During this time the defendant was continuously in police custody. He had no opportunity to meditate or reflect upon his situation after the *Miranda* advisement was given. The circumstances of this case compel us to conclude that the original taint had not dissipated at the time the 7:14 a.m. statement was made. *See People v. Pineda,* 182 Colo. 385, 513 P.2d 452 (1973); *People v. Algien, supra.*

■ The trial court found that, even if it had determined that the taint of the original illegal interrogation had been purged, the 7:14 a.m. statement would have been inadmissible because the defendant had not knowingly, voluntarily, and intelligently waived his *Miranda* rights. The burden of establishing waiver rests upon the People. *People v. Stephens,* 188 Colo. 8, 532 P.2d 728 (1975). A waiver must be established by clear and convincing evidence. *Constantine v. People,* 178 Colo. 16, 495 P.2d 208 (1972). The waiver need not be express and the defendant's refusal to sign a written acknowledgment is not preclusive of a knowing and intelligent waiver. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct.

1755, 60 L.Ed.2d 286 (1979); *People v. Stephens, supra*. In determining whether the defendant has waived his constitutional rights, the court must consider all of the circumstances, including details of the interrogation and the defendant's conduct. *North Carolina v. Butler, supra; People v. Ferran,* 196 Colo. 513, 591 P.2d 1013 (1978); *Reed v. People,* 171 Colo. 421, 567 P.2d 809 (1970).

In the instant case, the defendant was first advised of his *Miranda* rights immediately after he had made an incriminating response to the detective's initial question. Although the defendant acknowledged on a written advisement form that he understood those rights, he did not sign a portion of that form stating that, with knowledge of his rights, he wished voluntarily to talk to the police. The detective never asked the defendant if he was waiving his privilege against self-incrimination and his right to counsel. Furthermore, in the course of his tape-recorded statement, in response to the detective's question as to where the defendant got the equipment used on the girl, the defendant said, "I don't want to talk about it." Despite this statement, the detective continued the questioning without determining whether the defendant was invoking his privilege against self-incrimination or was merely reluctant to answer questions about the equipment used on the girl. Based on these circumstances, the trial court properly determined that the defendant did not make a knowing, voluntary, and intelligent waiver of his rights.

Although the defendant's 7:14 a.m. statement cannot be used in the prosecution's case in chief, it can be used for impeachment purposes if the statement was voluntarily made, i.e., if the "trustworthiness of the evidence satisfies legal standards." *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), *citing Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971); *People v. Velarde,* 196 Colo. 254, 586 P.2d 6 (1978). The trial court found that the record contained no evidence which would render the defendant's statement involuntary or untrustworthy. This finding is supported by the record and therefore will not be disturbed on review. *People v. Martinez, supra; People v. Medina,* 180 Colo. 56, 501 P.2d 1332 (1972).

### III.

Finally, the People urge that we reverse the trial court's ruling suppressing the defendant's consent to search the locker as well as the items obtained when that locker was searched. Both the consent and the contents of the locker were suppressed as being the fruits of the interrogation which we held unlawful in Part II.

Generally, when a defendant contends that a search to which he consented violated his Fourth Amendment rights, the rights afforded in *Miranda v. Arizona, supra,* do not apply. *People v. Phillips,* 197 Colo. 546, 594 P.2d 1053 (1979). The inquiry is simply whether, based on the totality of the circumstances, the consent was voluntary.

*Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Phillips, supra.* Voluntariness is a question of fact. *Schneckloth v. Bustamonte, supra.* The People have the burden of proving voluntariness by clear and convincing evidence. *People v. Trujillo,* 40 Colo. App. 186, 576 P.2d 179 (1977). The fact that the defendant is in custody is not sufficient, in and of itself, to render the consent involuntary. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Capps v. People,* 162 Colo. 323, 426 P.2d 189 (1967).

In the instant case, the consent to search was signed by the defendant at 7:43 a.m., immediately following the 7:14 a.m. interrogation. The defendant had told the detective about the locker during the course of the interrogation. The defendant was given a written consent to search form in which he was advised of his right to refuse to allow the search. The trial court found that the defendant knowingly and voluntarily executed the consent to search. This finding is supported by the record and will not be disturbed on review. *People v. Trujillo, supra; People v. Martinez, supra; People v. Medina, supra.*

But in this case, our inquiry cannot end with the determination that the consent to search was voluntary. The police knowledge of the locker and of some of its contents and the defendant's consent to search were products of the interrogation of the defendant that commenced at 7:14 a.m., which violated the defendant's *Miranda* rights. Accordingly, the items obtained in the search, as well as the consent to search, must be suppressed as being the fruits of an unlawful interrogation. *Wong Sun v. United States, supra; cf. Commonwealth v. White,* _____Mass._____, 371 N.E.2d 777 (1977), *aff'd per curiam by an equally divided court sub nom. Massachusetts v. White,* 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978) (statements obtained in violation of *Miranda* rights cannot be used for the purpose of establishing probable cause sufficient to obtain a valid search warrant). We note, however, that, because the constitutional infirmities in the search are based on a *Miranda* violation and not a Fourth Amendment violation, the items seized may be used for impeachment purposes if the defendant testifies at trial. *See Oregon v. Hass, supra, citing Harris v. New York, supra; People v. Velarde, supra.*

We affirm the ruling of the trial court and remand this case for further proceedings consistent with this opinion.

JUSTICE ROVIRA specially concurs.
JUSTICE QUINN does not participate.

JUSTICE ROVIRA specially concurring:

Almost twenty years ago, the United States Supreme Court made a policy choice when it made applicable to the states the exclusionary rule for evidence in criminal cases.[1] This rule of evidence was originally applied to the use of evidence secured through a search and seizure conducted in violation of the Fourth Amendment, in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Since that time, reliable and probative evidence has been suppressed and excluded from criminal proceedings whenever it has been obtained through searches and seizures that violate the Fourth Amendment, confessions obtained in violation of the Fifth and Sixth Amendments, and identification testimony obtained in violation of these amendments.[2]

The basic rationale of the rule is that suppression of evidence obtained in violation of an individual's constitutional rights was necessary to deter the police from using improper methods to obtain that evidence.[3] Although other reasons have been advanced to support the rule, such as the need to protect privacy of the individual[4] and the need to avoid the evil of government participation in illegal activity,[5] it is clear that "the *raison d'etre* of the exclusionary rule is the deterrence of lawless law enforcement."[6]

As it must, the majority applies the exclusionary rule to the well stated findings of fact made by the trial court in this case. We have no alternative, and it is to this situation that my views are directed in this concurring opinion.

There can be no doubt that the constitutional guarantees of both the United States and Colorado Constitutions must be protected against unlawful acts of those we employ to uphold the law. Having thus stated a proposition with which I believe there can be little argument, the question remains as to what form that protection should take. Under existing doctrine as developed by the United States Supreme Court, the exclusionary rule is the sole method through which the cited constitutional guarantees may be protected.

---

[1] *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

[2] *Mapp v. Ohio, supra fn.* 1 (search and seizure); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (confessions); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (identification).

[3] The deterrence theory was reaffirmed by Justice Powell, writing for the Court in *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571 (1974): "the rule's prime purpose is to deter future unlawful police conduct." *See also Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

[4] Justice Clark in *Mapp v. Ohio, supra fn.* 1, 367 U.S. at 655, 81 S.Ct. at 1691, 6 L.Ed.2d at 1090.

[5] *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Justices Brandeis and Holmes dissenting).

[6] Traynor, *Mapp v. Ohio at Large in the Fifty States,* 1962 Duke L.J. 319, 334.

The exclusionary rule has been subject to continued and increasing criticism by scholars and judges.[7] The criticism which I find most compelling is that the impact of the exclusionary rule falls upon society as a whole rather than on the person who has violated another person's constitutional rights, the official wrongdoer.

Others have also directed their attention to the anomalous situation in which the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial suffers no direct or indirect sanction. As pointed out by Chief Justice Burger in his dissenting opinion in *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 416, 91 S.Ct. 1999, 2015, 29 L.Ed.2d 619, 638 (1971):

"[w]ith rare exceptions law enforcement agencies do not impose direct sanctions on the individual officer responsible for a particular judicial application of the suppression doctrine . . . . Thus there is virtually nothing done to bring about a change in his practices."

*See also* Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U.Chi. L.Rev. 665 (1970), where it was noted that "[but] diligent inquiry has failed to reveal a single law enforcement agency where individual sanctions are tied to an application of the exclusionary rule. The rule is apparently expected to achieve its purpose without them."

While other defects in the exclusionary rule have been the subject of comment,[8] no good purpose would be served by setting them out at length.

The purpose of a criminal trial is to determine the guilt or innocence of the accused. How can this be accomplished while at the same time protecting the constitutional rights of *all* citizens?

Chief Justice Burger in *Bivens* suggested that Congress take the lead and provide a meaningful and effective remedy against unlawful conduct by government officials, a remedy that would afford compensation and restitution for persons whose constitutional rights have been violated. Judge Wilkey[9] suggests disciplinary measures against erring law enforcement officials and effective civil damage action against both the police and the governmental agency which employs them. In support of the tort remedy approach, Professor Oaks has stated that:

"[a] practical tort remedy would give courts an occasion to rule on the content of constitutional rights (the Canadian example shows how), and it would provide the real consequence needed to give credibility to the

---

[7] Burns, *Mapp v. Ohio: An All-American Mistake,* 19 De Paul L.Rev. 80 (1969); Friendly, *The Bill of Rights as a Code of Criminal Procedure,* 53 Calif. L.Rev. 929 (1965); Schaefer, *The Fourteenth Amendment and Sanctity of the Person,* 64 Nw.U. L.Rev. 1 (1969).

[8] *See* Wilkey, *The Exclusionary Rule: Why Suppress Valid Evidence?,* 62 Judicature 214 (1978).

[9] Wilkey, *supra, fn.* 8.

guarantee. A tort remedy could break free of the narrow compass of the exclusionary rule, and provide a viable remedy with attendant direct deterrent effect upon the police whether the injured party was prosecuted or not. Such an arrangement is long overdue. It is time to have a comprehensive judicial remedy against all illegal arrests and searches and seizures by the police. And it is time to abandon the irrational and costly procedure by which police behavior is reviewed only when the injured party is prosecuted, and the only compensation for injury effectively puts both guilty parties beyond the reach of the law." Oaks, *supra,* 37 U.Chi. L.Rev. at 757. (Footnote omitted.)

In my view, it is necessary to adopt an effective alternative remedy to the exclusionary rule — a remedy that will both deter the governmental agent from improperly exercising the authority given to him and provide the citizen with an effective means of redress. In the absence of a change in position of the United States Supreme Court or action on the part of the Congress[10] or the state legislatures to develop such a remedy, however, there is no alternative to enforcement of the exclusionary rule.

---

[10] s. 881, 93rd Cong., 1st Sess. (1973), a proposal to abolish the exclusionary rule and, in lieu thereof, impose financial liability on the federal government to the victims of illegal search and seizure.