The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Rudy SAIZ, Defendant–Appellee.

No. 80SA100.

Supreme Court of Colorado, En Banc.

Nov. 17, 1980.

J. E. Losavio, Jr., Dist. Atty., Amy S. Isaminger, Deputy Dist. Atty., Pueblo, for plaintiff–appellant.

Darol C. Biddle, Pueblo, for defendant–appellee.

LOHR, Justice.

In this interlocutory appeal pursuant to C.A.R. 4.1, the People challenge the trial court's ruling that portions of a statement by the defendant, Rudy Saiz, are inadmissible because they were obtained unconstitutionally. We approve that ruling.

The defendant, who was sixteen years old at the time of the crimes, was convicted of first–degree murder, section 18–3–102, C.R.S.1973 (1978 Repl.Vol. 8), first–degree burglary, section 18–4–202, C.R.S.1973 (1978 Repl.Vol. 8), and aggravated robbery, section 18–4–302, C.R.S.1973 (1978 Repl.Vol. 8), in criminal proceedings in district court.[1] The convictions resulted from a second jury trial after the first trial had ended in a mistrial. In *People v. Saiz*, Colo.App., 600 P.2d 97 (1979), the court of appeals reversed the convictions on grounds that certain statements and other evidence were unconstitutionally obtained and therefore improperly admitted at the trial.

Before the anticipated third trial the People filed a notice of intent to use another specified statement of the defendant. The defendant then moved to suppress that evidence. After hearing, the trial court found

---

1. See section 19–1–104(4), C.R.S.1973 (now in 1978 Repl.Vol. 8).

that the decedent's wallet had been suppressed as evidence earlier and ruled that statements of the defendant which concern the wallet will not be admissible at the defendant's new trial. That ruling is the subject of the People's interlocutory appeal.

The facts of the case are as follows.[2] On August 17, 1974, a man was found in his home in a severely beaten condition. The effects of the beating caused his death the following day. By talking to various witnesses, the police learned that a young man had been seen coming out of the victim's yard carrying a hammer, that someone had been observed throwing a hammer onto the roof of a shed nearby, and that the defendant had been seen inside a neighbor's garage and cutting through another neighbor's backyard at relevant times. The witnesses' description of the clothing worn by the defendant was similar to other witnesses' description of that worn by the young man with the hammer.

On August 20 two officers went to the defendant's home and requested that he accompany them to the police station. The defendant and his parents did so.

Upon arrival at the station the defendant was questioned as a "witness" regarding his whereabouts on the morning of August 17. When the defendant stated that he had not left his home that morning, the police suspected that he was lying and advised him of his rights. The defendant then was given a polygraph examination to which he and his parents consented. From the results of this test, the police believed that the defendant was either involved in or had knowledge of the incident. Upon being told of the test results, the defendant's mother talked with the defendant privately. He told her that he had found the victim's wallet and that he had overheard a conversation implicating two individuals.[3] The mother related this information to the officers and the defendant was kept in custody overnight.

On the following morning officers questioned the defendant out of the presence of his parents, and without further advisement as to his rights, regarding the discovery of the wallet. Before that questioning, the police had talked to one of the individuals to whom the defendant had referred the previous night and were told a story by him that differed from what the defendant had said. When confronted with this account, the defendant stated that he had been walking near the victim's house when he saw someone running down the alley behind the house. This person, who was carrying a hammer, fell down and dropped a wallet. After the person got up and kept running, the defendant picked up the wallet, removed the $40 in it, and discarded it. At the conclusion of his description of those events, the defendant agreed to lead the police to the wallet, and did so.

Upon recovering the wallet, the defendant was taken back to the station to look at police photos to determine whom he had seen drop the wallet. An officer told the defendant that he had to tell what he knew about the crime. The defendant then stated that he and another person "did it." At this point questioning ceased and the defendant's parents were brought to the station.

The defendant and his parents were advised of his rights at the outset of the ensuing interview (the "noon–to–one statement"). After the defendant and his father agreed to proceed without an attorney, the defendant denied involvement in the incident, reverting to his prior statement that he saw someone else drop the wallet. The defendant subsequently stated that he did not want to say any more, but, after continued urging to tell the truth by the officers and the defendant's mother, he stated that

2. We utilize the statement of the facts of the case set forth in the opinion of the court of appeals in *People v. Saiz, supra,* with minor changes. Those facts were taken from findings of the trial court in ruling on an earlier motion to suppress evidence.

3. This was the trial court's finding. Our review of the record indicates that the finding is not fully supported in that the defendant's connection with the wallet was not discovered until the next morning when officers talked with one of the individuals implicated in the defendant's story to his mother.

he had stood watch while someone else went into the victim's house.

At the conclusion of the noon–to–one statement, the defendant agreed to take another polygraph test. During this test, outside the presence of his parents, the defendant stated that he alone was responsible for the crimes. This final statement was then repeated by the defendant in front of his parents.

Upon motion before the first trial, the trial court suppressed all statements made by the defendant out of the presence of his parents under section 19–2–102(3)(c)(I), C.R.S.1973 (now in 1978 Repl.Vol. 8). The repetition of the defendant's final polygraph statement was also suppressed, because the trial court found that, although the defendant's parents were present, "the original taint of illegality had in no way been removed." However, the trial court refused to suppress the noon–to–one statement. At the second trial an officer who was present during the noon–to–one statement testified as to what the defendant had said, concentrating almost exclusively on the latter part of the interview in which the defendant admitted his complicity in the crime. The defendant was convicted and he appealed.

The court of appeals held that the part of the noon–to–one statement which followed the defendant's assertion that he was unwilling to talk further should have been suppressed.[4] *People v. Saiz, supra.*

The only remaining part of the noon–to–one statement not already suppressed is the first part, in which the defendant again told of seeing the alleged perpetrator running from the vicinity of the crime, slipping and losing the wallet, which the defendant then rifled and discarded. It is this part of the noon–to–one statement which the People seek to use in evidence at the defendant's new trial. The trial court ruled "[t]hat statements of the defendant which concern the decedent's wallet will not be admitted as evidence, and any statements made by the defendant in the 'noon–to–one statement' concerning the wallet are suppressed as evidence at the trial."[5]

I.

The defendant argues that the statements in question have already been suppressed by either the court of appeals or by the trial court in the trials and suppression proceedings before and during the trial which resulted in the defendant's conviction, and therefore the People are precluded from raising that issue on appeal.

Our reading of the court of appeals' opinion satisfies us that it did not suppress the statements now in question. Because we conclude the trial court was correct in holding the statements of the defendant which concern the decedent's wallet inadmissible, we need not consider whether the trial court's earlier rulings should be construed as having already suppressed that evidence.[6] For the same reason we need not

4. The basis for that ruling was that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), required that interrogation must cease if the individual indicates in any manner at any time prior to or during questioning that he wishes to remain silent. This requirement was imposed as a protection for the constitutional privilege against self–incrimination. The court of appeals also held that the wallet should have been suppressed, as a fruit of the illegal forenoon questioning.

5. The defendant's motion to suppress extended to all statements made by him to law enforcement officers on August 21, 1974. Although no part of the requested relief was denied specifically, the relief granted is less extensive than that requested.

6. The record of the trial court's rulings is ambiguous as to which parts of the noon–to–one statement have been suppressed. In ruling on the pretrial motion to suppress all of the defendant's statements before the first trial, the trial judge did not suppress any part of the noon–to–one statement. He specifically considered the second part of that statement (the part after the defendant said he did not wish to talk further) and found it admissible. The court of appeals reversed that latter holding. *People v. Saiz, supra.* During the first trial, which ended in a mistrial, the trial judge held the first part of the noon–to–one statement tainted by the prior illegal questioning, and further stated that "if suppression of that statement is requested, although it is, as I say, exculpatory, that statement will be suppressed." In the second trial, which resulted not

consider whether the People would be foreclosed from challenging any such prior ruling by interlocutory appeal in the present proceedings.

## II.

█ Evidence which has been obtained by exploitation of initial unconstitutional police action is inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1968); *People v. Bates*, 190 Colo. 291, 546 P.2d 491 (1976); *see also Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). However, if that evidence has been obtained by means sufficiently distinguishable from the prior illegality, it may be purged of the primary taint and therefore admissible. *Wong Sun v. United States, supra*; *People v. Lowe*, Colo., 616 P.2d 118 (1980).

█ Where statements sought to be introduced have been elicited immediately following unconstitutional questioning, the burden is on the prosecution to establish that those subsequent statements were not the product of the prior illegal interrogation. *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *People v. Lowe, supra*.

We first consider whether the fruit of the poisonous tree doctrine applies to statements obtained from a juvenile without a *Miranda* advisement and in absence of his parents in violation of section 19–2–102(3)(c)(I), C.R.S.1973. Finding that it does, we then consider whether the People have met the burden of showing that the first part of the noon–to–one statement, to the extent it concerns the decedent's wallet, was not the product of the immediately preceding questioning conducted in violation of that statute.

## A.

The illegal police action which allegedly tainted the statements at issue here was the questioning of the defendant on the morning of August 21, 1974. Beginning at approximately 10:00 a. m. this questioning produced a statement from the defendant concerning his observation of the alleged perpetrator running from the scene, slipping, and dropping a wallet. The defendant then led the police to the wallet. Shortly before noon, the defendant admitted that he and another "did it." At no time during this period were the defendant's parents present. Nor was the defendant advised of his rights before or during the questioning.

The trial court suppressed all of the statements made during the morning of August 21, 1974, and before the noon–to–one statement pursuant to section 19–2–102(3)(c)(I), C.R.S.1973, which provides as follows:

"No statements or admissions of a child made as a result of interrogation of the child by a law enforcement official concerning acts alleged to have been committed by the child which would constitute a crime if committed by an adult shall be admissible in evidence against that child unless a parent, guardian, or legal custodian of the child was present at such interrogation and child and his parent, guardian, or legal custodian were advised of the child's right to remain silent, that any statements made may be used against him in a court of law, the right of the presence of an attorney during such interrogation, and the right to have counsel appointed if so requested at the time of the interrogation; except that, if a public defender or counsel representing the child is present at such interrogation, such statements or admissions may be admissible in evidence even though the child's parent, guardian, or legal custodian was not present."

By requiring the presence of a parent, legal guardian, or attorney during the advisement of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and during any interrogation, the

the defendant's convictions, a portion of the first part of the noon–to–one statement was received in evidence without a specific objec-

tion that it violated the ruling made during the first trial. On appeal before the court of appeals the quoted ruling was not challenged.

statute provides an "additional and necessary assurance that the juvenile's Fifth Amendment right against self–incrimination ... will be fully afforded to him." *People v. Maes*, 194 Colo. 235, 237, 571 P.2d 305, 306 (1977); *see also People v. McAnally*, 192 Colo. 12, 554 P.2d 1100 (1976).

The "fruit of the poisonous tree" doctrine applies to *Miranda* violations. *United States v. Nash*, 563 F.2d 1166 (5th Cir. 1977); *Randall v. Estelle*, 492 F.2d 118 (5th Cir. 1974); *Fisher v. Scafati*, 439 F.2d 307 (1st Cir.), *cert. denied*, 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971); *Gilpin v. United States*, 415 F.2d 638 (5th Cir. 1969); *People v. Lowe, supra*; *People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972). Because section 19–2–102(3)(c)(I), C.R.S.1973, was enacted to safeguard the privilege against self–incrimination, the same privilege protected by *Miranda*, we conclude that the "fruit of the poisonous tree" doctrine applies to violation of that statute as well.

### B.

Not all evidence is rendered inadmissible simply because it would not have come to light but for the unconstitutional actions of the police. *See Wong Sun v. United States, supra*. The pertinent inquiry is whether the events separating the initial illegal questioning from the statements here sought to be introduced have so dissipated the causal link between them as to render the offered evidence significantly free from contamination. *See Wong Sun v. United States, supra*.

The passage of time, for example, may allow the taint of an illegal interrogation to dissipate and so sever the connection between the responses produced from that interrogation and later admissions. *See Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *People v. Algien, supra*. But here the statements sought to be introduced were procured almost imme-

diately after the illegally obtained admission of guilt. The interview in the chief's office was in effect a continuation of the prior questioning, pausing only to insure the parents' presence for what the police believed would be a repetition of the prior incriminating statement. *See People v. Lowe, supra*; *People v. Algien, supra*. The defendant, a juvenile, minutes earlier contradicted his original exculpatory version of how he came into possession of the wallet by admitting complicity in the crime. He was not advised that his inconsistent confession and exculpatory statement could not be used against him. When questioning resumed shortly after he had let the cat out of the bag, the psychological disadvantage of having admitted his guilt and contradicted his exculpatory account of the incident was at its peak. Although a suspect who gives a statement under circumstances violative of his constitutional rights is not perpetually disabled from making other admissible statements, *see United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed.2d 1654 (1947), under the circumstances of this case, neither time nor informed reflection had been permitted the defendant. *See People v. Algien, supra*. The presence of the defendant's parents did not dissipate the taint, for they contributed to the pressures brought to bear on the defendant to tell the police what he knew of the incident. The illegal taint as to statements concerning the decedent's wallet therefore remained undissipated.

Nor did simply reciting the warnings required by section 19–2–102(3)(c)(I), C.R.S. 1973, sever the connection between the illegal forenoon questioning and the defendant's statements concerning the decedent's wallet in the noon–to–one statement. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *People v. Lowe, supra*; *People v. Bates, supra*.[7] The People did not

---

7. "This would in effect undermine *Miranda*, for police could procure a confession absent the warnings, then take the suspect out for dinner, let him shower, shave, get a good twelve hours' sleep, and the next day let two different offi-

cers warn and question him. The questioning need not even refer tangentially to the previous confession; for the suspect has those spoken words imprinted on his mind and assumes they can be used against him. Under such circum-

carry their burden to establish that the statements suppressed were not the product of the prior illegal interrogation. The trial court properly ruled the statements concerning the decedent's wallet inadmissible.

We approve the ruling of the trial court.

ROVIRA, J., dissents.

ROVIRA, Justice, dissenting:

I respectfully dissent.

In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the United States Supreme Court established a "causal connection" test for determining whether a criminal suspect's incriminating statements are "tainted" by prior official illegality. *Accord Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).[1] The court held that *"Miranda* warnings, *alone* and *per se*, cannot always make the act [of confessing] sufficiently a product of free will to break . . . the causal connection between the illegality and the confession." *Brown v. Illinois, supra*, 422 U.S. at 603, 95 S.Ct. at 2261. The essential question to be answered is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *See People v. Hillyard*, 197 Colo. 83, 589 P.2d 939 (1979); *People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972). If a criminal suspect's statement is sufficiently the product

of his free will, the causal connection between police illegality and this evidence is broken, and no taint attaches to it. *Brown v. Illinois, supra; Wong Sun v. United States, supra.* The presence of official illegality "does not *per se* require suppression of evidence seized thereafter." *People v. Hillyard, supra*, at 85, 589 P.2d at 940; *People v. Bates*, 190 Colo. 291, 546 P.2d 491 (1976).

I wish to emphasize the limited nature of the evidence at issue in this case: the defendant gave a superficially exculpatory statement, after being given *Miranda* warnings, in the presence of his parents, and after waiving the presence of counsel, that he saw an "alleged perpetrator running from the vicinity of the crime, slipping and losing the [victim's] wallet, which the defendant then rifled and discarded." For police investigatory purposes, the defendant had admitted personal knowledge about incriminating evidence and thus, from his own lips, connected himself to the crime. But this statement followed the defendant's prior admission of personal guilt in the crime, made during illegal interrogation, and must be evaluated in the whole constellation of facts surrounding its utterance, "taking into consideration such factors as the voluntariness of the defendant's communications, the degree of police misconduct and any relevant intervening circumstances." *People v. Hillyard, supra*, at 89, 589 P.2d at 941; *Brown v. Illinois, supra.*

The majority has stressed the temporal proximity of the illegally obtained admis-

---

stances is any waiver the product of a free will and a rational intellect?" R. Pitler, *The Fruit of the Poisonous Tree Revisited and Shepardized*, 56 Cal.L.Rev. 579, 617 (1968).

1. Both *Brown v. Illinois, supra*, and *Dunaway v. New York, supra*, are concerned with the taint that attaches to statements which are the product of illegal seizures of suspects by investigating police officers. The present case involves a violation of section 19–2–102(3)(c)(I), C.R.S.1973, which protects a juvenile from the admission of statements or evidence which results from criminal investigatory interrogation. The *Brown* test of causal connection seems well adapted to analysis of questions about the "fruit of the poisonous tree." However, the

voluntariness of admissions is ordinarily tested by the totality of the circumstances; and it should be remembered that an "intervening independent act of a free will" alone may be enough to break the causal connection between the official illegality and the suspect's subsequent statement in cases, such as this one, which involve Fifth Amendment values rather than Fourth Amendment ones, where no *Miranda* violations are involved, and where the suspect has waived his *Miranda* rights. *See Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *Brown v. Illinois, supra. Cf. People v. Lowe*, Colo. 616 P.2d 118 (1980).

sion of guilt and the defendant's (perhaps) misguided but self–serving statement that he saw someone else fleeing the scene of the crime. The court holds that once the defendant "let the cat out of the bag" and admitted personal guilt, he lacked the time to reflect upon his right to be silent, despite *Miranda* warnings and the presence of his parents, in the face of further questioning which would have been proper if untainted.

In my judgment, the facts weigh differently. The trial court found that, prior to the officers' questioning of the defendant outside the presence of a parent, he had already admitted to his mother that he had some information about the victim's wallet and the circumstances of his death. She had related this information to the police on August 20, 1974. The defendant told his mother an exculpatory story to explain what had happened—that he found the wallet, having overheard a conversation implicating others. This version of events then changed when the police illegally questioned him on the morning of August 21; but he did not repudiate its basic feature—knowledge about the wallet. Later the same day, in the noon–to–one interrogation, after he was given *Miranda* warnings in addition to those he was given on August 20, in the presence of his parents, and after he and his father waived any right to have an attorney present during questioning, he again offered this second version of events to the police during the initial part of the interview. Any inconsistency between this statement and the truth surrounding the crime with which the defendant is charged was not the police officers' invention. Their illegal exploration of these inconsistencies, after the defendant's attempt to exercise his right to be silent, has been excluded from evidence. *People v. Saiz*, 42 Colo. App. 469, 600 P.2d 97 (1979). But this court has no reasonable basis to find that the statement here at issue is not precisely what the defendant wanted the police to hear and wanted the police to believe. On the contrary, this statement was consistent with what the defendant already had told his mother under circumstances that were not tainted with official illegality. But for

the temporal proximity of illegal questioning and seizure of evidence under section 19–2–102(3)(c)(I), C.R.S.1973, all evidence points to the voluntariness of the defendant's statement. Even this temporal relationship is an ambiguous factor, given that the defendant had already related a similar statement to his mother which she repeated to the police, and given also that he may have had personal reasons to seek to mislead investigators. *See Dunaway v. New York, supra* (Stevens, J., concurring).

The Supreme Court has held that *Miranda* warnings are an "important factor" to consider in determining whether the causal link between official illegality and incriminating statements made during police custody has been broken. *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. *See People v. Hillyard, supra.* These warnings have been given little importance by the majority, if any.

It is at least arguable whether the whole pattern of police misconduct displayed in the investigation of this case was more negligent than purposeful. Absent contrary findings, in my opinion there can be no doubt that the police were simply doing their duty when they again informed the defendant of his *Miranda* rights, after obtaining the presence of his parents before talking any more to him.

It is this final factor, the presence of the defendant's parents, which serves as the kind of intervening circumstance that, on its own, breaks the chain of events leading from the defendant's illegal interrogation to the statement which is at issue. *Cf. People v. Hillyard* (Erickson, J., dissenting). The clear statutory purpose behind section 19–2–102(3)(c)(I), C.R.S.1973, was to afford special protection to a juvenile who is in police custody because of alleged criminal acts. *People v. Maes*, 194 Colo. 235, 571 P.2d 305 (1977). The defendant was, during the period in question, afforded the opportunity to have parental guidance during interrogation, and his father as well as he himself waived the presence of counsel after his *Miranda* advisement. *See People v. Hayhurst*, 194 Colo. 292, 571 P.2d 721 (1977).

The fact that his parents may have been emotionally upset by their son's possible involvement in a crime or that their admonitions to tell the truth led to his making subsequent incriminating statements which are *not* at issue here, does not mean that their interests were adverse to him or that they somehow failed to be "on the side" of their child. *See People v. Hayhurst, supra;* *cf. People v. Maes, supra.* The defendant's parents were in fact "the neutral counselors contemplated by the statute." *People v. McAnally,* 192 Colo. 12, 15, 554 P.2d 1100, 1103 (1976).

When this last factor, his parents' presence, is considered in light of the other circumstances surrounding the statement the defendant gave during the first part of his noon–to–one interview, the effect of the prior official illegality is so distinguishable as to be purged of the primary taint. The statement itself was not the result of official exploitation of the illegality. It was voluntarily given. I would not exclude it here.