The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

David H. WOOD, Defendant–Appellee.

No. 05SA251.

Supreme Court of Colorado.

May 30, 2006.

---

Mitchell R. Morrissey, District Attorney, Evan W. Jones, Deputy District Attorney, Denver, for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, T. Marshal Seufert, Deputy State Public Defender, Kevin Pauly, Deputy State Public Defender, Denver, for Defendant–Appellee.

MARTINEZ, Justice.

This case comes before the court on an interlocutory appeal from the trial court, pursuant to C.A.R. 4.1. The People challenge an order of the trial court suppressing statements made by the defendant on the day of his arrest. The trial court suppressed the statements for being involuntary and for violating the defendant's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We find that the statements were made voluntarily but that many of the statements were obtained in violation of *Miranda*'s procedural safeguards. We affirm the order of the trial court in part and reverse in part.

## I. Facts and Proceedings Below

On December 1, 2004, Defendant, David Wood, was arrested pursuant to an arrest warrant at a Denver homeless shelter. Wood was transported to Denver Police Department headquarters for questioning. He was initially taken to a holding cell. Later that evening, Wood met with Detective Mark Crider in a stationhouse interview room.

At the beginning of the interview, Detective Crider told Wood that the purpose of the interview was to "just have a conversation," and "to hear [Wood's] side of the story." Detective Crider also stated that before they could begin, he needed to read "a couple forms." He then informed Wood that they were being video and audio taped.

Before Detective Crider could proceed with the interview, the conversation became sidetracked when Wood expressed concerns about the Denver Police Department's booking policy with respect to personal belongings and cash. While answering Wood's questions, Detective Crider attempted to return to the forms, stating "let me get this going and we'll talk." After answering Wood's questions, Detective Crider again indicated "all we want to do now is just hear your side of the story ... about what happened." Before continuing, Detective Crider said "Let me read this video form first and we'll move on." He then told Wood his "job is just to investigate and to get both sides of the stories," and the "[o]ne side I don't have is your side."

Next, Detective Crider twice stated he needed to "read off a form." Detective Cri-

der then returned to the preliminaries of the interview. He noted the time and that the investigation concerned a homicide. However, he did not advise Wood of his *Miranda* rights or indicate that the "form" concerned Wood's rights.

After Detective Crider mentioned that the investigation concerned a homicide, Wood expressed shock and became visibly upset by the news. Shortly thereafter, Wood stated, "it was self-defense" and "it was an accident." In response to Wood's statement that it was self-defense, Detective Crider stated "that's what we need to hear. That's what we want to talk about, ok?" He then told Wood he would finish with the sheet and then "we'll move on and we'll discuss what happened, ok?" Detective Crider asked Wood "to try and be strong" and encouraged Wood to take his time and collect himself before proceeding. Wood continued to make incriminating statements, including "I killed him," and "he provoked it, it was self-defense, but I didn't mean to take his life." Detective Crider interrupted Wood and told him that "before we can talk about this, I need to make sure you understand your rights. Let me finish reading this advisement form, okay?" Although Detective Crider mentioned Wood's rights for the first time at this point in the interview, he again failed to complete the *Miranda* advisement.

Wood continued to make a number of comments, stating: "it's [sic] an accident," "he's the one that provoked it," "I didn't know he died, though," and "he was the aggressor." Detective Crider reiterated that he wanted "to find out what happened" and "get to the bottom of it," but did not complete the *Miranda* advisement until nearly twenty minutes into the interview.

After Detective Crider read the *Miranda* advisement, Wood acknowledged that he understood his rights and signed the form. Detective Crider went on to read the advisement that the interview was being made voluntarily. At that point, Wood interrupted to ask Detective Crider about a lawyer, "I definitely need a lawyer, right?" Detective Crider did not stop the interview, but responded by telling Wood that the decision to have counsel present was entirely up to him

and made it clear that if he wanted a lawyer present, the interview would end. Detective Crider then attempted to reassure Wood by emphasizing that he wanted to hear Wood's side of the story.

In assuring Wood that everything was "above board," Detective Crider reminded Wood that he was being audio and video taped and that everything Wood said was being recorded. Detective Crider then left Wood alone in the interview room for approximately thirty seconds. When Wood was alone in the interview room, he spontaneously said, "Jesus, he died. Wow, I killed a man. Wow." When Detective Crider returned to the room, he reminded Wood that the interview was voluntary and he was free to have an attorney present. Wood then stated, "I'd rather have an attorney to represent me." Detective Crider stopped the interview, and Wood was taken to a holding cell.

Later that evening, Wood indicated to an officer that he wished to speak with Detective Crider again. Detective Crider went to Wood's holding cell. According to Detective Crider's testimony, Wood indicated uncertainty about whether he would speak with Detective Crider. Detective Crider advised Wood to speak with him only if Wood was certain, and told Wood he would not speak with him further because Wood had requested an attorney. Without prompting, Wood then offered to provide information about illegal drug activity for assistance with the murder case. Detective Crider told Wood he would not speak with him further.

Wood was charged with first degree murder. At trial, Wood moved to suppress the statements he made during the interview and later in the holding cell, arguing they were obtained in violation of his *Miranda* rights and his right to counsel.

The trial court granted Wood's motion to suppress all of the statements made while in the interview room, along with statements made to Detective Crider upon reinitiation of contact later that same evening. The People filed an interlocutory appeal challenging the suppression of Wood's statements, asserting Wood's statements were offered voluntarily

and spontaneously and were not the product of interrogation or official coercion. Following two subsequent remands, the trial court issued a written order detailing its findings.

We now review the People's interlocutory challenge of the trial court's decision.

## II. Trial Court Orders

Initially, we note the trial court's orders blur the distinction between suppressing Wood's statements on the basis of *Miranda* or on grounds that the statements were made involuntarily. The court's original order was an oral order issued on July 18, 2005. A subsequent written order making additional findings was issued on March 13, 2006. The court's written order states in relevant part:

> Under the totality of circumstances, this Court finds that the Defendant's statements should not be allowed as part of this case. *They were not voluntary. People v. Klausner*, 74 P.3d 421 (Colo.App.2003), *People v. Valdez*, 969 P.2d 208 (Colo.1998). *At no time did the Defendant waive his right to remain silent or to be represented by an attorney.* Under no fair interpretation can the Defendant's statements made in a state of shock, distress and dismay while in the presence of an investigating detective who persisted for over 20 minutes to complete an advisement be viewed as fairly obtained in this custodial police interrogation. The statements were obtained in direct response to shocking, surprising and distressful facts presented to Defendant by the investigating detective who for over 20 minutes tried to complete a proper advisement (and, in the process, kept the "conversation" going). They were also obtained as a result of repeated inquisitive police comments/questions such as, "we want to hear your side of the story" (i.e., "What happened?" or "Tell us what happened?").

(Emphasis added). In this written order, the trial court concludes the statements were not voluntary and cites two cases which turn upon voluntariness and not *Miranda*. Next, the court finds that Wood did not waive his right to remain silent or to be represented by

an attorney—considerations central to a *Miranda* analysis.

In contrast, the trial court's earlier oral order suppressing the statements indicated that Wood's statements were "clearly voluntary," but suppressed all of Wood's statements on the basis that Wood requested counsel. While the oral order suppressed Wood's statements solely on an alleged violation of Wood's right to counsel, the written order implicates both voluntariness and *Miranda*. Statements may be suppressed when the defendant does not make a statement voluntarily or when the statement is obtained in violation of *Miranda*. Although these inquiries are similar, they are distinct and independent grounds for suppression.

As the trial court's written order was issued subsequent to the oral order and pursuant to an order from this court to "[make] findings of fact and conclusions of law identifying with specificity each statement suppressed and stating the factual and legal grounds for suppressing each such statement," we view it as controlling wherever the trial court orders appear inconsistent. Accordingly, we address the trial court's finding of involuntariness in the written order, whether Wood's statements were properly suppressed for violating his rights under *Miranda*, and then separately address Wood's statements made subsequent to his request for counsel that touch upon issues in addition to *Miranda*.

## III. Voluntariness

Both the United States Constitution and the Colorado Constitution prohibit the admission of involuntary statements into evidence. *See People v. Medina*, 25 P.3d 1216, 1221 (Colo.2001). These protections apply irrespective of whether a defendant is in custody or whether the contested remarks are inculpatory or exculpatory. *See id.* The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's statements were made voluntarily. *People v. Valdez*, 969 P.2d 208, 210 (Colo. 1998). The ultimate test of involuntariness is whether a defendant's will has been overborne. *See id.* at 211. We defer to the trial court's findings of fact if they are supported

by competent evidence in the record, but review the legal effect of those facts de novo. *Id.*

■ Although there are a number of circumstances the court may consider in its voluntariness analysis, the "defendant's mental condition by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness." *Id. See Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *People v. Gennings,* 808 P.2d 839, 844 (Colo.1991). Before a statement may be suppressed, there must be coercive conduct which plays a significant role in inducing that statement. *Medina,* 25 P.3d at 1222; *Gennings,* 808 P.2d at 843–44. Coercive government conduct is a "necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly,* 479 U.S. at 167, 107 S.Ct. 515. *See People v. Humphrey,* 132 P.3d 352, 360 (2006); *Valdez,* 969 P.2d at 211.

■ Here, there is simply no evidence of coercive conduct. The trial court did not make any findings which would support such a conclusion, nor is there any evidence in the record to suggest coercive action. In its oral order, the trial court noted it did not "place any fault or culpability or impropriety on the part of the officer in the way this interview was conducted," and later described Detective Crider's efforts as "relationship-building." Absent a finding that Wood's will had been overborne by coercive official action, the trial court erred as a matter of law when it determined that Wood's statements were involuntary. *See Humphrey,* 132 P.3d at 360–63. Accordingly, we reverse the trial court's finding of involuntariness, and now determine whether Wood's statements were properly suppressed for violating his rights under *Miranda.*

### IV. *Miranda*

■ Under *Miranda,* a defendant's statements made during the course of a custodial police interrogation are inadmissible as evidence in a prosecutor's case-in-chief unless the prosecutor establishes that the defendant was advised of certain constitutional rights and waived those rights. *People v. Howard,* 92 P.3d 445, 449 (Colo.2004); *People v. Mack,* 895 P.2d 530, 534 (Colo.1995). For the *Miranda* guidelines to apply, "the person making the statement must be in custody and the statement must be the product of police interrogation." *People v. Johnson,* 30 P.3d 718, 723 (Colo.App.2000) (citing *People v. Breidenbach,* 875 P.2d 879 (Colo.1994)). A person in custody must be informed "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. When the *Miranda* warnings are absent or there is no valid waiver of these rights, the defendant's statements may not be admitted into evidence as part of the prosecution's case-in-chief. *Howard,* 92 P.3d at 449; *Mack,* 895 P.2d at 534.

In the trial court's written order, the court noted Wood was "unquestionably in a custodial interrogation." The parties do not dispute that Wood was in custody when he made the suppressed statements, however, they do contest whether Wood's statements were elicited by interrogation.

■ The *Miranda* protections apply when a suspect is in custody and is subject to interrogation. *See Johnson,* 30 P.3d at 723. In contrast, purely spontaneous or volunteered statements made in the absence of counsel are admissible as "[t]he Fifth Amendment protects defendants from improper forms of police interrogation, not from their own impulses to speak." *People v. Gonzales,* 987 P.2d 239, 243 (Colo.1999). An officer is under no duty to close his ears to evidence freely offered by the defendant while properly attempting to comply with *Miranda. People v. Smith,* 173 Colo. 10, 475 P.2d 627, 628 (1970). *See also Gonzales,* 987 P.2d at 241. Accordingly, the determination of whether Wood's statements were the product of interrogation is pivotal to the admissibility finding.

■ In *Rhode Island v. Innis,* 446 U.S. 291, 297–302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the United States Supreme Court addressed the meaning of "interrogation" as it pertains to *Miranda.* The Court held "[t]he *Miranda* safeguards come into play

whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01, 100 S.Ct. 1682. *See Gonzales,* 987 P.2d at 240–41. Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. *See Gonzales,* 987 P.2d at 240–41; *People v. Johnson,* 671 P.2d 958, 962 (Colo.1983).

■ In determining whether an officer should have known his actions or words were reasonably likely to elicit an incriminating response, "we consider the totality of the circumstances surrounding the making of the statement." *Gonzales,* 987 P.2d at 241. "We focus our inquiry on whether the officer reasonably should have known that his words or actions would cause the suspect to perceive that he was being interrogated." *Id.*

■ In describing the initial circumstances of the interview, the trial court states in the written order:

The first nine or ten minutes of the interrogation session consist of largely incidental, irrelevant conversation. During the relationship-building, trust-building time, *the interrogating detective reassures the Defendant,* who is clearly suspicious of the police, *in order to obtain his statement. The detective informs the Defendant on numerous occasions during this time that he just wants to "have a conversation" to "hear your side of the story."* This theme is repeated throughout the interview session. . . . the detective informs the Defendant that the interview is part of a *homicide* investigation. The defendant is immediately and unequivocally shocked to learn this news. He promptly breaks down crying and is extremely upset. At this point, no advisement has been given. While still in a state of significant distress and shock, prompted by the detective's statements in commencing the interrogation advisement, the Defendant states, "It's self-defense." *The Defendant is then told, in essence, to pull himself together.* This theme is also repeated throughout the interview session.

(record citations omitted) (first, second, and fourth emphases added).

Although the trial court noted that Wood's statements were "arguably spontaneous," it concluded they were "made directly in response to the detective's relationship-building efforts," and were "in response to information presented by the detective about the homicide investigation and in response to the detective's desire to get Defendant's 'side of the story.'" Accordingly, the court suppressed Wood's statements as the product of custodial interrogation absent an advisement of his rights under *Miranda.*

In *People v. Dracon,* 884 P.2d 712 (Colo. 1994), this court reviewed a case with similar circumstances. In *Dracon,* the defendant accompanied an officer to the Denver Police Department to discuss the circumstances of a homicide investigation. *Id.* at 714. The defendant was not advised that she was free to leave, nor was she advised of her rights under *Miranda. Id.* at 714–15. The interrogating officer told the defendant "he 'needed to know what information she had' so that he could 'figure out what happened.'" *Id.* at 715. The officer proceeded to formally question the defendant. *Id.*

After recognizing that interrogation includes more than direct questioning by a police officer and includes "any words or actions on the part of the officer that he or she should know are reasonably likely to elicit an incriminating response from the defendant," this court determined that the district court correctly found the defendant was subject to custodial interrogation. *Id.* at 718. Because the defendant did not have the benefit of a *Miranda* warning, the statements were suppressed. *Id.* at 716.

This court did not explain in detail when the interrogation in *Dracon* commenced. *See id.* at 717–18. Nonetheless, *Dracon* is instructive, and similar to this case in many important respects. The defendant in *Dracon* was told the purpose of the interview was to get "what information she had" so the police could "figure out what happened." *Id.* at 715. Similarly, Detective Crider told Wood repeatedly that the purpose of the interview was just "to get both sides" and

encouraged Wood to tell his side of the story. In both instances, the interviewing detectives failed to advise the defendants of their *Miranda* rights and allowed the interviews to proceed without a knowing, voluntary, and intelligent waiver of those rights. In Wood's case, this is particularly problematic as Wood was under arrest and Detective Crider was well-aware that Wood was a suspect in a homicide investigation.

At the time of the interview, Wood had been placed under arrest and was removed from the holding cell to meet with Detective Crider. Wood was not informed prior to meeting with Detective Crider of the nature of the charges he was facing or of the victim's death. Neither the fact of Wood's custody nor Detective Crider's explanation that the interview concerned a homicide investigation were enough to amount to "interrogation." *See People v. Rivas,* 13 P.3d 315, 319 (Colo.2000). However, these facts are relevant in our consideration of whether Detective Crider's statements to the effect of "we want to hear your side of the story" and his "relationship-building" efforts were tantamount to interrogation.

The fact of Wood's custody combined with the nature of the investigation and Wood's harried emotional state upon learning of the victim's death are relevant circumstances. They set the stage for Detective Crider to invite comments without formally asking questions. Given these circumstances, Detective Crider's statements encouraging Wood to provide a narrative of events as soon as Detective Crider was able to dispense with some "forms," amounted to the functional equivalent of interrogation.

Initially, Detective Crider did not indicate that the "forms" were anything more than a mere formality. Before ever mentioning that the "forms" concerned Wood's rights, Detective Crider told Wood "we'll talk," and stated numerous times that he wanted to get Wood's side of the story. Detective Crider twice suggested that they needed to complete a form in order to "move on." And, in response to an incriminating statement by Wood, Detective Crider stated "that's what we need to hear. That's what we want to talk about, ok?" While under lesser circum-stances his comments might have been innocuous, here Detective Crider should have known his statements were reasonably likely to elicit a response from Wood.

The trial court found that Wood was in a state of "shock, distress and dismay" and that Detective Crider's "relationship-building" efforts and suggestions to Wood to "tell his side of the story" were designed to provoke a response from Wood. The trial court's written order states in relevant part: "[d]uring this relationship-building, trust-building time, *the interrogating detective reassures the Defendant,* who is clearly suspicious of the police, *in order to obtain his statement.*" (Emphasis added). The court concludes that Wood's statements were made in response to "the detective's relationship-building efforts," the "information presented by the detective," and "the detective's desire *to get Defendant's 'side of the story.'*" (Emphasis added). In effect, the trial court found that Detective Crider's comments were intended to elicit information from Wood and accomplished that end. We give deference to the trial court's finding that Detective Crider's comments were intended to elicit a response as it is adequately supported by the record. *See People v. Lowe,* 200 Colo. 470, 616 P.2d 118, 122 (1980) (deferring to trial court's finding that officer intended to elicit a response from the defendant); *see also People v. MacCallum,* 925 P.2d 758, 766 (Colo.1996) ("We must defer to the trial court's findings on these factual issues unless the findings are not adequately supported by the record or if the trial court applied the incorrect legal standard.").

Although Detective Crider's intent is not the primary focus of our inquiry, it is relevant. *Innis,* 446 U.S. at 302 n. 7, 100 S.Ct. 1682. As the Supreme Court noted in *Innis,* "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id. See also Lowe,* 616 P.2d at 122; *People v. Shetewi,* 679 P.2d 1107, 1107 (Colo.App.1984). In considering the court's factual finding of intent along with the other circumstances, we conclude, as did the trial court, that Detec-

tive Crider should have known his words and actions were reasonably likely to elicit an incriminating response. Accordingly, we find Wood's statements to Detective Crider were made pursuant to a custodial interrogation. Because Wood was not informed of his rights and did not waive his rights, the trial court properly suppressed Wood's statements made prior to the *Miranda* advisement for violating *Miranda*'s procedural safeguards.

■ We also find that Wood's statements to Detective Crider following the *Miranda* advisement were properly suppressed. An additional aspect of *Miranda* surfaced upon Wood's invocation of his right to counsel. Once a defendant invokes the right to counsel, that right must be scrupulously honored and questioning must cease until counsel has been provided. *See People v. Adkins,* 113 P.3d 788, 791 (Colo.2005). The People concede that Wood's inquiry as to whether he should have an attorney present immediately following Detective Crider's advisement was a sufficient request for counsel to trigger *Miranda*'s protections and the subsequent conversation is inadmissible. Wood's statements following his initial request for counsel are largely inconsequential, except for statements to the effect that he knew "what happened" and did not know that the victim had died. Following his second request for counsel, Wood made additional statements, although none of any significance. Here, we uphold the trial court's order barring all of Wood's statements made in the presence of Detective Crider, including those following both Wood's initial and subsequent request for counsel. We consider the statements made while he was alone in the room in the next section.

## V.

■ In its order granting the suppression motion, the trial court also suppressed statements Wood made while alone in the interview room. The court notes in its written order that Wood "never consented to the audio and video interview which was first mentioned in passing," and concludes "Defendant's entire statement should be and is, hereby, suppressed for all purposes." The inference here is that Wood's lack of express

consent to the audio and video taping factored into the trial court's ruling. We see two problems with this approach.

First, the *Miranda* protections do not apply here as there was no interrogation. A defendant's spontaneous utterances will not be excluded where there is no interrogation. *See Innis,* 446 U.S. at 299–300, 100 S.Ct. 1682; *Gonzales,* 987 P.2d at 241. Wood was left alone in the room and stated that he killed a man without any prompting whatsoever. The procedural protections afforded by *Miranda* simply do not apply to these spontaneous statements.

Second, no authority is cited to us supporting the exclusion of evidence where consent for audio or video taping is not obtained from a defendant during a custodial interrogation. Furthermore, even if there were such a requirement, it would not apply here. Wood was informed several times by Detective Crider in unmistakable terms that the interview was being recorded on audio and video tape. Wood knew his statements were being recorded and did not express any alarm, concern, or interest in these pronouncements. Any supposed ignorance of the recording cannot be inferred from the record below, particularly when his spontaneous outburst to the empty room was preceded by a warning that he was being recorded by mere moments.

Accordingly, we find the trial court erred in suppressing statements made by Wood while he was alone in the interview room and reverse that portion of the trial court's order.

■ Following Wood's second request for counsel, the interview ceased and Wood was returned to a holding cell. Later that same evening, Wood told an officer he wished to speak with Detective Crider again. According to Detective Crider, after he went to the cell and Wood expressed uncertainty about speaking with Detective Crider, Wood spontaneously offered to trade information he had on drug activity. Detective Crider informed Wood he could not speak with him without counsel present and left the holding cell area.

The trial court initially suppressed Wood's statements to Detective Crider on the grounds that Wood had previously requested

counsel. Following a remand from this court, the trial court did not further address the circumstances of these statements in its written order.

 A suspect's invocation of the right to counsel must be scrupulously honored. *Gonzales,* 987 P.2d at 241. Questioning must cease until the suspect's request has been honored or he is released. *Rivas,* 13 P.3d at 318. However, where the defendant reinitiates contact with law enforcement and volunteers information, "the Fifth Amendment and *Miranda* do not prohibit the evidentiary use of volunteered, non-compelled statements made by a suspect in the absence of counsel." *Gonzales,* 987 P.2d at 241.

Here, Wood independently reinitiated contact with Detective Crider. When Detective Crider met with Wood, he honored Wood's request for counsel by reminding Wood that the right had been invoked, declining to interrogate Wood, and leaving once Wood indicated he was unsure whether he wished to speak with Detective Crider. Wood's statement to Detective Crider regarding drug activity was not the product of interrogation, much less coercion. The statements appear entirely voluntary and beyond the scope of a custodial interrogation. Accordingly, they do not violate *Miranda,* nor do they run afoul of Detective Crider's obligation to scrupulously honor Wood's request for counsel.

Consequently, we find the statements made to Detective Crider while Wood was in the holding cell are admissible. The omission of findings by the trial court in its subsequent order suggests the trial court did not find facts which would indicate the statements were involuntary or otherwise violated the protections afforded by *Miranda.* Accordingly, the trial court erred as a matter of law when it suppressed the evidentiary use of these statements where the facts show the statements were voluntary and Wood's *Miranda* protections were honored by Detective Crider.

## VI. Conclusion

Although the trial court's written order concluded Wood's statements were involun-tary, we find no facts in the record to support this conclusion. Wood was emotionally distraught throughout much of the interview, however, this is not enough, by itself, to render his statements involuntary. The necessary element of official coercion is missing. Accordingly, we reverse the trial court's decision as there was no evidence of coercion to support the finding that Wood's will had been overborne.

The trial court properly suppressed many of Wood's statements for violating Wood's rights under *Miranda.* The trial court's finding that Detective Crider intended to elicit a response from Wood along with Detective Crider's statements and Wood's emotional state demonstrate that Detective Crider should have known his words and actions were reasonably likely to elicit an incriminating response. Hence, Wood's statements were made pursuant to a custodial interrogation, and Detective Crider's failure to advise Wood of his rights and obtain a knowing, voluntary, and intelligent waiver of those rights prior to the interrogation violated the procedural safeguards of *Miranda.* Accordingly, statements made to Detective Crider during the interview were appropriately suppressed by the trial court and may not be used apart from impeachment. However, the statements made by Wood while he was alone in the interview room and later that evening should not have been excluded on these grounds, as they were voluntary statements made in the absence of a custodial interrogation and did not infringe upon Wood's Fifth Amendment right to counsel.

Consistent with these findings, we affirm the trial court's order in part and reverse in part.

Justice COATS concurs in part and dissents in part, and Justice EID joins in the concurrence and dissent.

Justice COATS, concurring in part and dissenting in part.

I respectfully dissent from that portion of the court's judgment suppressing certain of the defendant's statements as a violation of

his *Miranda* rights.[1] Although it may have little or no actual effect in this case, I fear the majority's *Miranda* holding is likely to have a substantial and deleterious impact on police practices generally and the use of volunteered statements as evidence in this jurisdiction. Because I believe the majority also misconstrues and misapplies controlling United States Supreme Court precedent in arriving at its holding, I write separately to briefly register my disagreement.

As the majority acknowledges, statements made by an accused while in custody, in the absence of an effective waiver of his *Miranda* rights, violate the dictates of *Miranda* only if they were the product of police interrogation. Maj. op. at 749. While interrogation is not limited to actual questioning, but also includes any words or actions the police should know are likely to elicit an incriminating response, *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), it is not so broad a concept as to encompass the entire time-frame of a custodial interview. Clearly, not every statement made by a defendant while he is in custody and in the presence of an officer for an interview must be treated as the product of custodial interrogation. *See State v. Fekete*, 120 N.M. 290, 901 P.2d 708, 718 (1995) ("Volunteered statements come within one of two categories: statements which the police did not attempt to elicit, and statements made during custodial interrogation that may be in response to police questioning but are unresponsive to the questions asked.").

More to the point of this case, however, determining whether a suspect is willing to be interviewed does not itself constitute interrogation. Merely notifying a defendant of the reasons for his arrest or the charges against him does not constitute interrogation, *see People v. Rivas*, 13 P.3d 315 (Colo.2000); *see also United States v. Benton*, 996 F.2d 642 (3d Cir.1993), nor does merely advising him of his *Miranda* rights, *see People v. Smith*, 173 Colo. 10, 475 P.2d 627 (1970); *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711 (1998). And police are obviously not required to close their ears to information volunteered to them while they are properly attempting to comply with the *Miranda* guidelines. *Smith*, 173 Colo. at 14, 475 P.2d at 628. While expressly asking a defendant whether he would like to give his side of the story may well amount to interrogation, *State v. Hebert*, 277 Kan. 61, 82 P.3d 470, 482 (2004) (finding direct inquiry whether defendant "[w]ould [ ] like the opportunity to tell [his] side of the story," prior to *Miranda* warnings, to be interrogation), surely the same cannot be said of merely explaining to a defendant, in the course of administering *Miranda* warnings, that the purpose of the interview will be to give him a chance to tell his side of the story.

The majority defers to the trial court's finding, which it considers to be, in effect, a determination that police efforts at relationship building, including characterizing the upcoming interview as a chance for the defendant to tell his side of the story, were intended to elicit information from the defendant. Maj. op. at 751. I do not believe it is at all clear, however, that the trial court suggested the police were attempting to elicit a statement from the defendant before he had waived his *Miranda* rights, and I do not believe the record would support such a suggestion if it had. In any event, whether police actions were reasonably likely to elicit an incriminating response is a question of law, subject to plenary or de novo review by a reviewing court. *People v. Gonzales*, 987 P.2d 239, 242 (Colo.1999); *see also People v. Matheny*, 46 P.3d 453, 461–62 (Colo.2002) (noting this Court's independent review of mixed questions of law and fact in variety of related contexts). As a matter of law, the majority should have held that merely informing a defendant that he will be interviewed to get his side of the story while attempting to administer *Miranda* warnings is insufficient to render every statement he volunteers thereafter the product of custodial interrogation.

In *Miranda*, the Supreme Court carefully made the choice to guard against the inherently coercive atmosphere of the stationhouse interrogation by requiring a voluntary and intelligent waiver of the defendant's rights to remain silent and to have counsel

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

present. *Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602. It therefore applied its prophylactic warning requirement and exclusionary remedy only to statements made while in custody and as a response to police interrogation. *Id.* at 444, 86 S.Ct. 1602. In striking this balance, it squarely rejected the notion that inculpatory statements from the defendant's own mouth are in some way unworthy evidence or that using such statements to establish his guilt is an undesirable way of solving crimes. *Id.* at 481, 86 S.Ct. 1602.

The scope of prophylactic rules designed to modify executive branch behavior is peculiarly within the province of the court creating them. Unlike the majority, I would not expand the exclusionary remedy of *Miranda* beyond its original purpose, as determined by the United States Supreme Court. I therefore respectfully dissent from this portion of the majority's opinion.

I am authorized to state Justice EID joins in this concurrence and dissent.