21CA1322 Peo v Bachmann 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1322 Larimer County District Court No. 02CR1018 Honorable Juan G. Villaseñor, Judge The People of the State of Colorado, Plaintiff-Appellee, v. James Thomas Bachmann, Defendant-Appellant. JUDGMENT AFFIRMED Division II Opinion by JUDGE SULLIVAN Fox and Grove, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Stephen Arvin, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant
1 ¶ 1 Defendant, James Thomas Bachmann, appeals the judgment of conviction entered on jury verdicts finding him guilty of several charges arising from his sexual assaults of a child, B.B. We affirm. I. Background ¶ 2 Bachmann first met B.B. when B.B. was six or seven years old. Bachmann, a family friend, fulfilled a fatherly role in B.B.’s life and would frequently take B.B. to the movies and on trips, and invite him to stay the night at his house. When B.B. was approximately twelve, Bachmann began to fondle him and perform oral sex on him while B.B. pretended to be asleep. B.B. testified this happened for approximately three years. B.B. also testified that he believed he heard Bachmann take a picture of him during one of these incidents. ¶ 3 In 2002, B.B. told his mother what had been happening at Bachmann’s house. B.B.’s mother contacted law enforcement shortly thereafter. ¶ 4 Detective Kristy Volesky and Detective Jeremy Yonce began an investigation. Detective Volesky arranged for Anthony Newt, Bachmann’s friend and B.B.’s stepfather, to place a pretext telephone call to Bachmann. At one point in the call, during which 
2 Newt discussed B.B.’s allegations against Bachmann for nearly an hour, Newt asked whether the conduct alleged by B.B. was true. Bachmann responded, “Maybe it is, but maybe it isn’t! I have no fuckin’ idea!” ¶ 5 After the call, Bachmann left his house and was contacted by law enforcement; officers eventually requested a medical check due to Bachmann’s agitated state. After Bachmann checked into a hospital, Detective Yonce and an assisting detective, Detective Darel King, searched Bachmann’s house and found a photograph of B.B. with his genitalia partially exposed. After the hospital discharged Bachmann, and based on the pretext call, B.B.’s allegations, and the search of Bachmann’s house, Detective Volesky took Bachmann into custody. ¶ 6 Before trial, Bachmann moved to suppress his statements made during the pretext call, arguing that they were coerced and thus involuntary. After holding a hearing, the court denied Bachmann’s motion to suppress, finding his statements weren’t involuntary. ¶ 7 Before Bachmann’s scheduled trial in 2004, he fled the United States to Switzerland. Law enforcement couldn’t extradite him due 
3 to restrictions enforced by the Swiss government. Law enforcement later obtained an international warrant, and Bachmann was eventually detained and extradited from Qatar in 2019. A five-day jury trial commenced in 2021. The court informed the jury of Bachmann’s flight following a stipulation by the parties. ¶ 8 At trial, B.B., B.B.’s mother, Newt, Detective Volesky, Detective Yonce, and Detective King testified for the prosecution. The jury heard a recording of the pretext call between Newt and Bachmann and also received the photograph of B.B. The jury found Bachmann guilty of one count each of sexual assault on a child (position of trust), sexual assault on a child (position of trust, pattern), sexual exploitation of a child (made material), sexual exploitation of a child (possessed material), and third degree sexual assault. ¶ 9 Bachmann now appeals. He contends that the trial court erred by (1) failing to suppress his statements made during the pretext call with Newt; (2) incorrectly instructing the jury on the pattern enhancer for sexual assault on a child by one in a position of trust; (3) entering separate convictions on the two counts for sexual assault on a child by one in a position of trust; and (4) entering separate convictions for sexual exploitation of a child 
4 (made material) and sexual exploitation of a child (possessed material). We disagree with these arguments and affirm. II. Pretext Telephone Call ¶ 10 Bachmann seeks de novo review of whether the trial court erred by denying his motion to suppress his statements made during the pretext call. Specifically, Bachmann argues that (1) Newt was an agent of the state; and (2) Newt’s questioning “shattered Bachmann physically and mentally, overbore Bachmann’s will, and rendered Bachmann’s statements involuntary.” We only address Bachmann’s second contention because, even assuming without deciding that Newt acted as an agent of the state, we nonetheless conclude that Bachmann’s statements were voluntary. A. Additional Facts ¶ 11 Detective Volesky discussed making a pretext telephone call with Newt in July 2002. Newt agreed to make the call. At the suppression hearing, Detective Volesky testified that she informed Newt that she would be listening in on the call and that his directive during the call, assuming B.B.’s allegations were true, was 
5 to tease out a confession from Bachmann “as to what happened in the past with [B.B.].” ¶ 12 Bachmann received Newt’s call at his residence and out of custody. The call lasted about fifty minutes. Bachmann became increasingly agitated as the call went on; after approximately thirty minutes, Bachmann could be heard dry heaving in another room. ¶ 13 At the beginning of the call, Newt said that B.B. told him everything, stating B.B. “wants no one to know” and that only “three [people]” (Newt, Bachmann, and B.B.) knew about Bachmann’s conduct. Newt later stated that Bachmann needed to come clean because Newt didn’t “want to go to [B.B.’s] mom” with the information and that B.B. didn’t want “anyone to know whatsoever.” Newt then said B.B. “wants to keep it quiet” and that he would “go along with [B.B.’s] wishes.” Newt next said that if he needed to take B.B. “to professional help,” he thought “they will report it immediately.” Bachmann told Newt that he only looked at B.B.’s penis, but denied having intercourse with B.B. ¶ 14 Shortly after, Bachmann expressed remorse at hurting B.B. when Newt said, “[I]f you love him, let’s hear it . . . now you need to fix it.” Newt later said that he “really doesn’t want [B.B.’s] dad to 
6 know about this” and that he was “sure [Bachmann]” didn’t want B.B.’s dad to know either. Bachmann, agitated, responded that his “heart is ripped.” About thirty-five minutes into the call, Newt asked Bachmann whether he wanted “[B.B.] to go to a therapist or something.” Bachmann stated he had to leave to attend a court hearing for a traffic offense and that he was “a fucking wreck.” Bachmann made the following statement shortly after: [NEWT]: [B.B.] told me what took place. He said you fondled him, you went down on him. Is that true? Just say yes or no, Jim. Is it true? [BACHMANN]: Maybe it is, but maybe it isn’t, I have no fuckin’ idea! ¶ 15 At the suppression hearing, the trial court (1) heard testimony from Detective Volesky regarding the logistics of the call; (2) listened to a recording of the call; and (3) read a transcript of the call. In its ruling from the bench denying the motion, the court found as follows: • Detective Volesky was present during the phone call and listened in on the conversation, but never directly addressed Bachmann; • Newt placed the call to Bachmann at his residence; 
7 • Detective Volesky may have written down or suggested a “question or two” for Newt to ask Bachmann, or may have suggested a method of questioning for Newt to undertake; and • Bachmann wasn’t in custody, in part because Bachmann was in his own home, he didn’t know Detective Volesky was listening, and he retained the ability to hang up the telephone at any time. The court ultimately denied Bachmann’s motion to suppress because of the following: • Bachmann received the call at his residence, out of custody, and retained the ability to hang up at any time; • Newt wasn’t an agent of the state when he made the call but was merely an interested party; • Newt implied that he could help keep the matter quiet, but those implied promises weren’t of the kind that rose to the level of promises by law enforcement that render a defendant’s statements involuntary; 
8 • the jury could determine what Bachmann’s emotions and reactions meant with respect to the allegations of his conduct; and • there was “very little direct confession or statement” made by Bachmann during the call. ¶ 16 At trial, the prosecution played the pretext call for the jury. Newt testified on cross-examination that he remained patient, courteous, not judgmental, and circumspect during the call. He explained that he didn’t raise his voice and he refrained from swearing at Bachmann. B. Standard of Review ¶ 17 We review a trial court’s ruling on a motion to suppress as a mixed question of law and fact. People v. Platt, 81 P.3d 1060, 1065 (Colo. 2004). “We will uphold a trial court’s findings of fact on the voluntariness of a statement when the findings are supported by adequate evidence in the record, but we review de novo a trial court’s ultimate determination of whether a statement was voluntary.” People v. Bryant, 2018 COA 53, ¶ 18. 
9 C. Applicable Law ¶ 18 The Due Process Clauses of the United States and Colorado Constitutions require that a defendant’s statements be voluntary for the statements to be admissible into evidence. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; Mincey v. Arizona, 437 U.S. 385, 397 (1978); People v. Raffaelli, 647 P.2d 230, 234 (Colo. 1982). The prosecution shoulders the burden of proving, by a preponderance of the evidence, that the defendant’s statements were voluntary. People v. Munoz-Diaz, 2023 COA 105, ¶ 13. ¶ 19 If a statement is made to law enforcement or an agent of law enforcement, we consider the totality of the circumstances and look to whether the officer or agent “overcame the defendant’s will” and induced their inculpatory statement. Id. at ¶ 14. We follow a two-
step inquiry when evaluating whether a defendant’s statement was voluntary: “(1) whether the official conduct was coercive and (2) whether the coercive conduct ‘played a significant role in inducing the statements.’” Id. (quoting People v. Ramadon, 2013 CO 68, ¶ 20). Both steps of the inquiry require that we consider a wide range of non-exhaustive factors: 1. whether the defendant was in custody; 
10 2. whether the defendant was free to leave; 3. whether the defendant was aware of the situation; 4. whether the police read Miranda rights to the defendant; 5. whether the defendant understood and waived Miranda rights; 6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation; 7. whether the statement was made during the interrogation or volunteered later; 8. whether the police threatened [the] defendant or promised anything directly or impliedly; 9. the method [or style] of the interrogation; 10. the defendant’s mental and physical condition just prior to the interrogation; 11. the length of the interrogation; 12. the location of the interrogation; and 13. the physical conditions of the location where the interrogation occurred. Cardman v. People, 2019 CO 73, ¶ 23 (quoting People in Interest of Z.T.T., 2017 CO 48, ¶ 13). ¶ 20 When weighing these factors, we don’t simply count the factors on each side but rather accord weight depending on the 
11 circumstances involved. Id. at ¶ 27. The critical inquiry is whether, under the circumstances, the interviewing officer “actually overbore the defendant’s will.” People v. McIntyre, 2014 CO 39, ¶ 19. D. Analysis ¶ 21 After reviewing the record and closely listening to the pretext call, we conclude Bachmann made several arguably inculpatory statements — the most arguably inculpatory one being that “maybe it is” true he committed the acts B.B. alleged. ¶ 22 The factors that weigh in favor of holding that Bachmann made the statements voluntarily include: Bachmann wasn’t in custody (factor 1); Bachmann was free to hang up and terminate the conversation (factor 2); Bachmann was free to hang up and consult with an attorney at any time (factor 6); Newt was calm, composed, and respectful throughout the call (factor 9); and Bachmann was in his own home during the call (factors 12 and 13). A factor that cuts both ways, but that we ultimately conclude weighs in favor of the statements’ voluntariness, is Bachmann’s physical and mental condition before and during the call (factor 10). ¶ 23 The factors that weigh in favor of holding that Bachmann made the statements involuntarily include: Bachmann wasn’t aware 
12 he was being recorded or that Detective Volesky was listening in (factor 3); Bachmann wasn’t read his Miranda rights (factors 4 and 5); Bachmann’s statements were made during the call (factor 7); and Newt impliedly promised to keep whatever Bachmann said between them so that others wouldn’t learn of Bachmann’s conduct (factor 8). ¶ 24 One factor — that the call lasted approximately fifty minutes (factor 11) — is neutral. An interview lasting approximately one hour is “neutral.” Cardman, ¶ 26. 1. Factors Favoring Voluntariness ¶ 25 We begin our analysis by considering the factors that weigh in favor of holding that Bachmann made his statements voluntarily. First, Bachmann argues that Newt’s method and style of questioning — referencing that B.B. needed help and suffered from Bachmann’s conduct — amount to police coercion that rendered his statements involuntary. We disagree. ¶ 26 At the outset, the trial court found, and our review of the call confirms, that Newt spoke to Bachmann in a calm, composed, and respectful manner. This weighs in favor of the statements’ voluntariness. See People v. Liggett, 2014 CO 72, ¶ 30 (concluding 
13 investigators’ calm and polite manner during questioning “cuts against” finding their conduct coercive). Defense counsel, too, agreed that Newt questioned Bachmann in a patient, nonjudgmental, and circumspect way. As a result, we disagree with Bachmann that Newt’s questioning was “relentless,” “demanding,” and “merciless.” ¶ 27 Bachmann also argues that, by referring to B.B., Newt exploited Bachmann’s “warmth for [B.B.] and desire to help him” and thus forced Bachmann to stay on the line, coercing him into making the statements. We disagree for two reasons. First, appealing to a defendant’s sense of morality during questioning is an acceptable tactic by law enforcement and doesn’t amount to unlawful coercion. See Munoz-Diaz, ¶ 25 (concluding officer’s appeals to a defendant’s religion and the family’s need for closure wasn’t impermissible coercion but rather implicated “only ‘moral and psychological pressures to confess emanating from sources other than official coercion’”) (citation omitted); see also People v. Theander, 2013 CO 15, ¶ 44 (“[I]t was not coercive for police to indicate . . . that [the defendant’s] children would want to know that [the defendant] had helped find their father’s killer.”). 
14 ¶ 28 Second, Bachmann — in his own residence, on his own phone, and out of custody — could have hung up the telephone at any time and for any reason. See People v. Zadra, 2013 COA 140, ¶ 34 (holding defendant’s statements were voluntary, despite officer’s “fatherly” tone and “insistence” that defendant tell the truth, where defendant came to the police station unescorted and was “free to leave at any time”), aff’d, 2017 CO 18. If Bachmann felt that Newt’s questioning warranted legal counsel, for example, Bachmann easily could have hung up the telephone to seek counsel. ¶ 29 Next, Bachmann contends that Newt exploited his weakened physical and mental condition during the call, rendering his statements involuntary. Again, we don’t perceive any unlawful coercion. As a threshold matter, we disagree with the People’s argument that Bachmann’s mental and physical condition before Newt’s questioning is the only interval we consider in our analysis. Colorado precedent indicates that a defendant’s mental and physical condition during questioning can also be relevant. See People v. Gennings, 808 P.2d 839, 844 (Colo. 1991). While more recent cases like Cardman and Z.T.T. appear to omit this part of the analysis when identifying the factors to be considered, they also 
15 make clear that their enumerated factors are “non-exhaustive.” Cardman, ¶ 23; Z.T.T., ¶ 13. ¶ 30 Nonetheless, we conclude that Newt didn’t exploit Bachmann’s mental or physical condition in a manner that coerced Bachmann into making his statements. Bachmann’s physical and mental condition appeared normal until approximately seventeen minutes into the call. While Bachmann exhibited signs of physical illness and mental anguish after that point, we discern no “police overreaching” or “coercive police conduct” by Newt that resulted in Bachmann making his statements. Colorado v. Connelly, 479 U.S. 157, 164 (1986) (“[A] defendant’s mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional ‘voluntariness.’”); see also People v. Humphrey, 132 P.3d 352, 361 (Colo. 2006) (“[T]he official misconduct must be causally related to the confession or statement.”). Rather, Newt maintained his calm and patient method of questioning throughout the call. ¶ 31 Bachmann, while upset, also demonstrated “an awareness of his situation and the consequences of speaking” by responding to Newt’s questions in a generally coherent and understandable 
16 fashion. People v. Cerda, 2024 CO 49, ¶ 45. Bachmann repeatedly mentioned, for example, that he wanted to help B.B. and that he was running late for his court hearing. That Bachmann became increasingly distraught as the call went on, without more, doesn’t indicate that Newt overbore Bachmann’s will. See People v. Smith, 716 P.2d 1115, 1118 (Colo. 1986) (“Simply because the defendant became upset when she learned that the victim had died was not a sufficient basis for the trial court’s conclusion that her statement was involuntary.”). ¶ 32 Bachmann’s reliance on Humphrey and Raffaelli is unavailing. In Humphrey, officers interrogated the defendant while she was in custody at a police station, recently injured, and awake for more than twenty-four hours. 132 P.3d at 354-55. During the interrogation, the officers purposefully exploited the defendant’s guilt by relaying that she had killed a man one day earlier — a fact she didn’t previously know. Id. at 354. The trial court made “detailed findings,” deferred to by the supreme court, that the officers asked argumentative questions, gave suggestive answers, and mischaracterized what the defendant had said, resulting in “psychological coercion” that the defendant had “little power to 
17 resist.” Id. at 361-62. Similarly, in Raffaelli, an officer interviewed the defendant in custody at a police station after he had recently witnessed the death of his two-month-old daughter. 647 P.2d at 231-32. The trial court made findings, again deferred to by the supreme court, that the officer’s interrogation was “accusatorial [in] nature.” Id. at 236. Based on expert psychiatric testimony indicating that the defendant’s emotional state rendered him particularly susceptible, the trial court found that the defendant’s statements were involuntary. Id. ¶ 33 Here, by contrast, Bachmann wasn’t in custody at a police station and Newt’s interview style was calm and patient rather than coercive. Moreover, nothing in the record suggests that Bachmann shared a mental or physical condition akin to the defendants in Humphrey and Raffaelli. Bachmann elicited no expert psychiatric testimony regarding his mental state, and the trial court made no findings suggesting that Bachmann suffered from a vulnerable or susceptible mental condition that rendered his statements involuntary. To the contrary, the trial court made findings, albeit after trial, that Bachmann made false statements during the call and attempted to manipulate Newt. Absent factual findings like 
18 those in Humphrey and Raffaelli, we conclude both cases are distinguishable. 2. Factors Favoring Involuntariness ¶ 34 We next turn to the factors weighing in favor of holding that Bachmann made his statements involuntarily to determine, in the totality of the circumstances, whether they outweigh the above factors pointing toward the statements’ voluntariness. Bachmann argues that Newt impliedly promised that his confession would forestall criminal consequences. He asserts that Newt promised that, in exchange for coming clean, Newt would keep his conduct secret and refrain from either telling B.B.’s father or sending B.B. to a therapist. While we agree with Bachmann that Newt made certain implied promises, we disagree that they rendered Bachmann’s statements involuntary. ¶ 35 At the outset, we conclude that the Miranda factors carry little weight here. Bachmann wasn’t in custody during the pretext call. Thus, Detective Volesky bore no obligation to read Bachmann his Miranda rights or request that he waive those rights. See People v. Wood, 135 P.3d 744, 749-50 (Colo. 2006). 
19 ¶ 36 Turning to Newt’s implied promises, we acknowledge that an implied promise made by an undercover government agent — one who the suspect has no reason to believe possesses authority to bind the government — can in some circumstances result in the suspect making a coerced inculpatory statement. See, e.g., Arizona v. Fulminante, 499 U.S. 279, 288 (1991) (holding that defendant’s inculpatory statement to jailhouse informant, motivated by fear of physical violence and the informant’s promise of protection, was coerced). But even accepting that, we nonetheless conclude that Newt’s implied promises didn’t play a significant role in inducing Bachmann’s statements. See Munoz-Diaz, ¶ 20. Unlike Cardman, ¶ 5, where the defendant responded to the detective’s explicit promise that he could “help [the case] go away” with “I would love that,” Bachmann didn’t utter his arguably inculpatory statements in reliance on any of Newt’s implied promises. To the contrary, when Newt impliedly promised that Bachmann, B.B., and Newt could remain the “only three people” who know about the situation, Bachmann responded, “I don’t care about that.” And throughout the conversation, Bachmann expressed neither a desire to avoid 
20 consequences nor any wish to keep B.B.’s allegations under wraps. See Munoz-Diaz, ¶¶ 21-22. ¶ 37 Finally, even if Bachmann was indirectly motivated to make his statements based on Newt’s implied promises, we conclude Newt nevertheless didn’t overcome Bachmann’s will. At most, Newt’s implied promises amount to what our supreme court has characterized as a “subtle form of psychological coercion” that “fall[s] far short” of the types of coercive statements that have been found to overcome a defendant’s will. Theander, ¶ 44 (collecting cases). ¶ 38 Accordingly, after weighing each of the factors and considering the totality of the circumstances, we agree with the trial court that Bachmann made his statements voluntarily. The trial court therefore didn’t err by denying Bachmann’s motion to suppress his statements made during pretext call. III. Jury Instruction ¶ 39 Next, Bachmann contends that the trial court plainly erred by improperly instructing the jury on the pattern of abuse sentence enhancer for sexual assault on a child by one in a position of trust. He asserts that the trial court failed to instruct the jury, consistent 
21 with section 18-3-405.3(2)(b), C.R.S. 2001,
1 that he could be convicted only if the acts constituting the pattern of sexual abuse were committed within ten years prior to the predicate offense charged in the information. We perceive no error. A. Additional Facts ¶ 40 In count two, the prosecution charged Bachmann with sexual assault on a child (position of trust, pattern) under section 18-3-
405.3(1) and (2)(b). The information stated that the acts alleged under count two occurred over a three-year period between August 1, 1998, and July 11, 2002. ¶ 41 Consistent with the information, B.B. testified that Bachmann sexually assaulted him on multiple occasions over the course of three years. The court instructed the jury on the pattern of abuse sentence enhancer as follows: Question 2: Did the defendant commit the sexual assault on a child as part of a pattern of sexual abuse? (Answer “Yes” or “No”). The defendant committed the sexual assault on a child as part of a pattern of sexual abuse only if he committed one or more incidents of 1 Section 18-3-405.3 has since been amended. We apply the version in effect at the time, section 18-3-405.3, C.R.S. 2001, here and in all subsequent references to this statute. 
22 sexual contact upon the same victim in addition to committing the sexual contact forming the basis for your guilty verdict on Count I, sexual assault on a child by one in a position of trust. ¶ 42 The instruction didn’t expressly state that the acts constituting the pattern of sexual abuse must have been committed within ten years prior to the predicate offense charged in the information. The court also instructed the jury on the definition of “pattern of abuse,” defining it as “the commission of two or more incidents of sexual contact involving a child when such offenses are committed by an actor upon the same victim.” See § 18-3-401(2.5), C.R.S. 2001. The court also provided a unanimity instruction, informing the jury that it could reach a guilty verdict only if the jury “either unanimously agree[d] that [Bachmann] committed the same act or acts, or that he committed all the acts alleged.” ¶ 43 The jury found Bachmann guilty of the predicate act of sexual assault on a child by one in a position of trust as alleged in count two. In a separate special interrogatory for count two, the jury answered “yes” to the question “Did the defendant commit Sexual Assault on a Child as part of a Pattern of Abuse?” Immediately below its answer, the jury found that Bachmann committed sexual 
23 contact “more than one time” between August 1, 1998, and October 31, 1998. It also found that he committed sexual contact “more than one time” between November 1, 1998, and July 9, 2001. In other words, the jury found that Bachmann committed at least four acts of sexual contact against B.B. over a three-year period. Before the jury began deliberations, the court read these verdict forms to the jury as part of its jury instructions. B. Standard of Review ¶ 44 Bachmann acknowledges that he failed to preserve this issue, limiting our review to plain error. Plain error is obvious and substantial. People v. Procasky, 2019 COA 181, ¶ 9. “In the jury instruction context, ‘the defendant must “demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction.”’” Hoggard v. People, 2020 CO 54, ¶ 13 (quoting People v. Miller, 113 P.3d 743, 750 (Colo. 2005)). C. Analysis ¶ 45 To be convicted of sexual assault on a child by one in a position of trust as part of a pattern of sexual abuse, the version of section 18-3-405.3 in effect at the time required that the acts 
24 constituting the pattern of sexual abuse be “committed within ten years prior to the offense charged in the information or indictment.” § 18-3-405.3(2)(b). ¶ 46 In People v. Honeysette, 53 P.3d 714, 716-18 (Colo. App. 2002), a division of this court rejected an argument similar to Bachmann’s, finding no plain error where the jury instruction on the pattern of abuse sentence enhancer failed to inform the jury that the acts constituting a pattern of abuse must have occurred within ten years prior to the offense charged in the information. The instructions in Honeysette informed the jury that it could find a pattern of sexual abuse only if it determined that the defendant committed two or more incidents of sexual contact against the victim during a specified nineteen-month period, which period was also alleged in the information. Id. at 717. Given this instruction, the division explained that it “would have been impossible” for the jury to find the defendant guilty of the pattern of abuse enhancer unless it found that he committed at least two separate acts of sexual contact against the same victim during the alleged nineteen-
month period. Id. at 718. As a result, the division determined that the ten-year requirement in the pattern of abuse statute was 
25 “necessarily satisfied.” Id.; see also § 18-3-405.3(2)(b) (“No specific date or time need be alleged for the pattern of sexual abuse . . . .”). ¶ 47 Here, Bachmann doesn’t dispute that the prosecution presented evidence of multiple sexual acts against B.B. during the three-year period alleged in the information. Nor does he dispute that the court instructed the jury regarding the three-year period when it read the verdict forms to the jury. After the court gave these instructions, the jury found that Bachmann committed at least four acts of sexual contact against B.B. over the same general three-year period. Under Honeysette, nothing more was required for the jury to find a pattern of abuse. See also People v. Melillo, 25 P.3d 769, 779 (Colo. 2001) (holding that the information charging a pattern of sexual abuse was sufficient where it alleged “that the pattern of sexual abuse occurred within a fifteen-month period of time . . . which clearly satisfies the ten-year period required by the statute”). ¶ 48 We aren’t persuaded otherwise by Bachmann’s reliance on People v. Gholston, 26 P.3d 1 (Colo. App. 2000), and People v. Graham, 876 P.2d 68 (Colo. App. 1994), both of which preceded Melillo and Honeysette. In Gholston, the division found no evidence 
26 in the record of any sexual abuse by the defendant in the ten years preceding the period alleged for the predicate act in the information. 26 P.3d at 14-15. But here, the evidence supports, and the jury found, that Bachmann committed multiple acts of sexual assault against B.B. over three years. Graham, involving the ex post facto application of the pattern of abuse statute, is similarly uninformative. There, the defendant was charged with several sexual assaults occurring before the pattern of abuse statute was enacted, but the jury wasn’t instructed that the defendant’s conviction of the predicate offense had to be based on an act occurring after the statute became effective. Graham, 876 P.2d at 71-72. Because Bachmann doesn’t make an ex post facto argument here, Graham doesn’t apply. ¶ 49 Accordingly, the trial court didn’t err, plainly or otherwise, when instructing the jury on the pattern of abuse sentence enhancer in count two. IV. Separate Convictions — Position of Trust ¶ 50 Bachmann next contends that the trial court erred by entering separate convictions for sexual assault on a child by one in a position of trust (count one), and sexual assault on a child by one 
27 in a position of trust as part of a pattern of abuse (count two). We don’t agree. A. Standard of Review and Applicable Legal Principles ¶ 51 The United States and Colorado Constitutions prohibit placing someone twice in jeopardy for the same offense. Whiteaker v. People, 2024 CO 25, ¶ 10. Thus, punishing an individual twice for the same offense runs afoul of double jeopardy principles. People v. Grosko, 2021 COA 28, ¶ 24. Although we agree with the People that Bachmann didn’t preserve this claim, we don’t review double jeopardy sentencing errors for plain error, but rather impose merger automatically for such errors. Whiteaker, ¶ 24. B. Analysis ¶ 52 We agree with Bachmann that a court “may not enter a separate conviction or sentence on a count that is only a sentence enhancer.” People v. Torrez, 2013 COA 37, ¶ 23. And we further agree that our supreme court has consistently described the pattern of abuse provision in section 18-3-405.3(2) as a sentence enhancer. People v. Simon, 266 P.3d 1099, 1108 n.9 (Colo. 2011). But one discrete count can sufficiently charge “the crime of sexual assault on a child, as well as the sentence enhancer because a single count 
28 may charge both a crime and a sentence enhancer.” Melillo, 25 P.3d at 777. That’s what occurred here in count two. ¶ 53 Bachmann was separately charged and found guilty of count one — sexual assault on a child by one in a position of trust — and count 2 — sexual assault on a child by one in a position of trust as part of a pattern of abuse. As in Melillo, count two sufficiently charged the crime of sexual assault on a child by one in a position of trust and the pattern of abuse sentence enhancer. Further, the trial court instructed the jury that a “separate offense is charged against [Bachmann] in each count of the information,” and that the jury should consider each count separately, uninfluenced from any other count.
2 We presume the jury understood and followed this instruction. People v. Moody, 676 P.2d 691, 697 (Colo. 1984). ¶ 54 Consistent with this instruction, the jury returned separate verdict forms finding Bachmann guilty on both count one and count two. On count two, the jury specifically found that, “with respect to 2 We decline to address Bachmann’s argument, raised for the first time in his reply brief, that the single reference to “Count I” in the pattern of abuse jury instruction indicates that count two operated only as a sentence enhancer. See People v. Cline, 2022 COA 135, ¶ 75 n.3. 
29 the verdict question for this count,” Bachmann committed at least four sexual contacts that constituted a pattern of abuse. (Emphasis added.) ¶ 55 Accordingly, the trial court didn’t err by entering separate convictions on count one and count two. V. Separate Convictions — Sexual Exploitation ¶ 56 Bachmann last contends that the trial court erred by entering separate convictions for both making and possessing sexually exploitative material of a child under section 18-6-403(3), C.R.S. 2001.
3 Leaning on People v. Meils, 2019 COA 180, ¶¶ 38-45, Bachmann argues that the trial court violated his right to be free from double jeopardy because (1) section 18-6-403(3) prescribes alternative ways of committing the same offense and (2) his creation and possession of the sexually exploitative photograph arose from the same act. We disagree. A. Standard of Review ¶ 57 Bachmann preserved this argument at sentencing, but the trial court never ruled on it. We review de novo Bachmann’s claim 3 Again, this statute has since changed and we refer throughout to the version in effect at the time: section 18-6-403, C.R.S. 2001. 
30 that his separate convictions violate constitutional protections against double jeopardy. Garcia v. People, 2023 CO 41, ¶ 13. B. Analysis ¶ 58 A double jeopardy violation occurs when a trial court imposes multiple convictions for the same offense based on the defendant’s committing the crime using more than one of the prohibited alternative means. People v. Barry, 2015 COA 4, ¶ 89. ¶ 59 As relevant here, section 18-6-403(3) at the time provided that a person commits sexual exploitation of a child if, for any purpose, the person knowingly: (b) Prepares, arranges for, publishes, including but not limited to publishing through digital or electronic means, produces, promotes, makes, sells, finances, offers, exhibits, advertises, deals in, or distributes, including but not limited to distributing through digital or electronic means, any sexually exploitative material; or (b.5) Possesses or controls any sexually exploitative material for any purpose . . . . § 18-6-403(3) (emphasis added). ¶ 60 In Meils, a division of this court held that section 18-6-403(3), written in the disjunctive, shows that the legislature intended to describe alternative ways of committing a single crime rather than 
31 to create separate offenses. Meils, ¶ 43. In Quintano v. People, 105 P.3d 585, 592 (Colo. 2005), however, our supreme court upheld a defendant’s convictions for three separate counts of sexual assault on a child, all occurring over a single day against the same victim, because the facts showed that “the defendant’s conduct was separate in temporal proximity and constituted a new volitional departure in his course of conduct.” ¶ 61 Here, the prosecution charged Bachmann with one count of sexual exploitation of a child for making sexually exploitative material, § 18-6-403(3)(b), and one count of sexual exploitation of a child for possessing sexually exploitative material, § 18-6-
403(3)(b.5). B.B. testified that he believed Bachmann took a photograph of him during one of the incidents of sexual assault. B.B. and his mother testified that the assaults occurred between his seventh- and ninth-grade years in school, or between 1998 and 2001. In 2002, Detective Yonce searched Bachmann’s residence and found a photograph of B.B. with his genitalia partially exposed. The detective testified that the photograph, taken on thirty-five-
millimeter film, required professional development. 
32 ¶ 62 Viewing the evidence here as the Quintano court did, the evidence shows that Bachmann took the photograph of B.B. sometime between 1998 and 2001, and that he possessed the photograph, at least in 2002 but perhaps earlier, after it had been professionally developed. We conclude that Bachmann’s distinct and separate acts — taking the photograph and later possessing it — were “separate in temporal proximity.” Quintano, 105 P.3d at 592. Stated differently, Bachmann’s choice to develop the photograph and then possess it constitutes a “volitional departure” from his decision to take the photograph; Bachmann no doubt had “sufficient time to reflect” between his taking of the photograph and his decision to possess the photograph after having it developed. Id. ¶ 63 Accordingly, the trial court didn’t err by entering separate convictions on the two counts of sexual exploitation of a child. VI. Disposition ¶ 64 We affirm the judgment. JUDGE FOX and JUDGE GROVE concur.